219 P.3d 216

ARIZONA ASSOCIATION OF PROVIDERS FOR PERSONS WITH DISABILITIES, an Arizona nonprofit corporation; Beverly Hermon, individually and as legal guardian for Eric Hermon; Toni McCleod, as legal guardian for E.K. and R.K.; Reeves Foundation, LLC, an Arizona limited liability company; Dominic Barreras; Abrio Family Services and Support, Inc., an Arizona corporation; Family Partners, LLC, an Arizona limited liability company; Metro Care Services, Inc., an Arizona corporation, Plaintiffs/Appellees,

v.

STATE of Arizona; Linda Blessing, in her official capacity as Director of the Arizona Department of Economic Security, Defendants/Appellants.

No. 1 CA–CV 09–0167.

Court of Appeals of Arizona, Division 1, Department E.

April 30, 2009.

Review Denied June 1, 2009.

Terry Goddard, Attorney General By Juliet Peters, Assistant Attorney General, Stacy L. Shuman, Assistant Attorney General, Kathleen E. Skinner, Assistant Attorney General, Nicole Davis, Assistant Attorney General, Phoenix, Attorneys for Defendants/Appellants.

Gammage & Burnham, P.L.C. By John R. Dacey, Ryan J. Millecam, Carolyn V. Williams, Cameron C. Artigue, Phoenix, Attorneys for Plaintiffs/Appellees.

Arizona Center for Disability Law By Jennifer L. Nye, Tucson, and Law Office of Michelle S. Michelson By Michelle S. Michelson, Tucson, Attorneys for Amicus Curiae, Arizona Center for Disability Law.

## OPINION

PER CURIAM.

¶ 1 In response to a severe budget crisis in early 2009, the State abruptly suspended certain services to developmentally disabled persons and cut by 10 percent the rates it pays for other services to the developmentally disabled. Days after the cuts were announced, plaintiffs filed a complaint and, after an accelerated two-day hearing, won an order enjoining the measures. Although plaintiffs contend the cuts threaten harm to a large number of vulnerable persons, we conclude plaintiffs failed to present substantial evidence to support the proposition that by imposing the service suspensions and the rate reductions, the State at this time has violated or is likely to violate state or federal law. Accordingly, for the reasons stated below, we vacate the injunction and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 The Division of Developmental Disabilities (the "Division"), a division of the Arizona Department of Economic Security ("DES"), provides a wide variety of services to developmentally disabled Arizonans, including infants, children and adults. The services at issue in this case are "home-and-community-based," meaning they generally are provided outside a facility or hospital. The record reveals such services to the developmentally disabled include, for example, night-time attendant care for an adult who is so disabled that he cannot live alone and physical and cognitive therapies for infants born with severe disabilities.[1]

¶ 3 Some of the developmentally disabled services the Division provides are paid for out of the State's general fund. The Division commonly refers to these services, which are not required by federal law, as "state-only" services.

¶ 4 Some developmentally disabled persons in Arizona receive services required by Title XIX of the federal Social Security Act. *See* 42 U.S.C.A. §§ 1396 *et seq.* (West 2003 & Supp.2007). Commonly known as Medicaid, Title XIX is a cooperative federal-state health benefits assistance program. *J.K. v. Dillenberg,* 836 F.Supp. 694, 696 (D.Ariz. 1993). States need not participate in Medicaid, but if they do, they must comply with all provisions of the federal act and its implementing regulations. *Id.* In Arizona, Medicaid services are administered by the Arizona Health Care Cost Containment System,

---

1. The record contains no definitive and comprehensive description of each of the cutbacks DES made in response to the budget crisis. During oral argument in this appeal, counsel for the State confirmed that the service suspensions and rate reductions affecting the developmentally disabled were directed only at home-and-community-ty-based services.

known as AHCCCS. Services that Medicaid requires be provided to developmentally disabled Arizonans are funded jointly by state and federal monies, at a ratio of roughly 35 to 65 percent. AHCCCS contracts with the Division to provide Medicaid services to qualified developmentally disabled persons.

¶ 5 To recap, the Division provides "state-only" developmentally disabled services and also, in its role as an AHCCCS contractor, provides other services to the developmentally disabled as required by Title XIX. At least as is revealed by the record in this case, the Division does not provide home-and-community-based services directly to the developmentally disabled; instead, it contracts with other entities or persons, called "providers," that actually deliver these services to the developmentally disabled.

¶ 6 Faced in early 2009 with a $1.6 billion state budget deficit for the current fiscal year, the Arizona legislature enacted Senate Bill 1001 ("S.B. 1001"), which ordered various budget cuts. S.B. 1001 was signed into law on January 31, 2009. The prior legislation establishing the state appropriation to DES and other state agencies for the 2008–2009 fiscal year had been 76 pages long, and the section pertaining to DES consumed 13 pages specifying line-item amounts for many programs within the Division. By contrast, S.B. 1001 was only 13 pages long. In a single one-line reference, S.B. 1001 ordered the amount previously appropriated to DES for the fiscal year reduced by $83,301,400. Including other measures such as fund transfers and expenditure reductions, S.B. 1001 reduced DES's fiscal-year budget by well over $100 million. 2009 Ariz. Sess. Laws, ch. 1 (1st Spec. Sess.).

¶ 7 Although the Joint Legislative Budget Committee had published some suggested cuts shortly before S.B. 1001 was enacted, the legislature did not in S.B. 1001 provide any specific direction to DES administrators about what program cuts or other measures to take to achieve the required budget reduction. *See id.* Working under tight time constraints due to the financial pressures facing state government, DES management combined program cuts, suspensions and re-

ductions to reduce expenditures by the required amount. DES cut 100 positions within the Division, a reduction that, by DES's own account, meant the Division would "not be able to comply with case management, timeliness, monitoring, medical, quality management, and business deliverable requirements." Two other measures taken by the Division are at issue in this case:

- The Division suspended all state-only home-and-community-based services to the developmentally disabled. According to the Division, this move meant that more than 4,000 developmentally disabled persons would lose "all of their services such as therapies, habilitation, employment supports, after school and summer programs, attendant care, respite and transportation."

- The Division unilaterally imposed a 10 percent reduction in the rates it pays providers for home-and-community-based services for the developmentally disabled. According to the Division, this measure affected "850 agency and 3,500 independent providers" of such services.

¶ 8 DES posted notice of the 10 percent rate reductions on its website on February 13; the record contains various forms of notices dated in February and as late as March 3 that were sent to affected providers. The record also contains a form letter dated March 3 to be sent to individuals whose state-only services were suspended.[2]

¶ 9 On February 27, a collection of individuals who receive services ("Plaintiff Beneficiaries") and service providers ("Plaintiff Providers") (collectively "Plaintiffs") filed a complaint against the State and Linda Blessing, interim director of DES (together, "the State"). Plaintiffs argued the service suspensions and rate reductions violated both state and federal law and sought declaratory and injunctive relief enjoining the measures. On the same day, Plaintiffs filed an application for a temporary restraining order and a preliminary injunction. The superior court declined to grant a temporary restraining order but set an expedited hearing on the request for a preliminary injunction. On

---

**2.** The letter stated the suspension would become effective March 13.

March 2 and March 3, the court heard testimony from several witnesses, including beneficiaries, providers and state officials.

¶ 10 On March 11, finding that "[p]reventing immediate and irreparable harm is required," the court issued a preliminary injunction that enjoined the State from "enforcing the service suspensions and reductions, rate cuts and the like . . . or from taking any similar actions, for so long as this Preliminary Injunction shall remain in force and effect." The court issued a 21–page minute entry containing its findings of fact and conclusions of law in support of the injunction.

¶ 11 The State filed a notice of appeal and on March 12 filed a motion in the superior court to stay the preliminary injunction. The superior court denied the stay request. This Court likewise declined to stay the injunction, but set an expedited briefing schedule that culminated in oral argument on April 23. We have jurisdiction over this appeal pursuant to · Arizona Revised Statutes ("A.R.S.") section 12–2101(F)(2) (2003).[3]

## DISCUSSION

### A. Standard of Review.

¶ 12 A party seeking a preliminary injunction traditionally must establish four criteria: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury if the requested relief is not granted, (3) a balance of hardships favoring that party, and (4) public policy favoring a grant of the injunction. *Shoen v. Shoen,* 167 Ariz. 58, 63, 804 P.2d 787, 792 (App.1990). A court applying this standard may apply a "sliding scale." *Smith v. Ariz. Citizens Clean Elections Comm'n,* 212 Ariz. 407, 410, ¶ 10, 132 P.3d 1187, 1190 (2006). In other words, "the moving party may establish either 1) probable success on the merits and the possibility of irreparable injury; or 2) the presence of serious questions and [that] 'the balance of hardships tip[s] sharply' in favor of the moving party." *Id.* at 411, ¶ 10, 132 P.3d at 1191

(citing *Shoen,* 167 Ariz. at 63, 804 P.2d at 792).

¶ 13 On appeal, Plaintiffs argue that because the balance of hardships tips sharply in their favor, we must affirm because the superior court correctly found "the presence of serious questions." In determining whether "serious questions" exist to support a preliminary injunction, however, the relevant inquiry is whether there are "serious questions *going to the merits.*" *Luckette v. Lewis,* 883 F.Supp. 471, 474 (D.Ariz.1995) (emphasis added). Thus, whether there are "serious questions" depends more on the strength of the legal claim than on the gravity of the issue. *See Sports Form, Inc. v. United Press Int'l, Inc.,* 686 F.2d 750, 754 (9th Cir.1982) (trial court did not abuse its discretion in denying preliminary injunction because party · seeking injunction had no chance of success on merits and thus, failed to raise "serious questions"); *Justice v. Nat'l Collegiate Athletic Ass'n,* 577 F.Supp. 356, 384 (D.Ariz.1983) (constitutional and antitrust claims raised no "serious questions" because they had "virtually no chance of success at all on the merits"); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948.3 (West 2009) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.").

¶ 14 We review the superior court's grant of a preliminary injunction for an abuse of discretion. *Ariz. Dep't of Pub. Safety v. Superior Court,* 190 Ariz. 490, 494, 949 P.2d 983, 987 (App.1997). Although we accept the court's findings of fact if they are supported by substantial evidence, we are mindful that "[a] court should not wield its injunctive power to disrupt the settled rights of others without first requiring from the applicant significant evidence that he is on legally solid ground." *P & P Mehta LLC v. Jones,* 211 Ariz. 505, 507, ¶ 9, 123 P.3d 1142, 1144 (App.2005). Moreover, the superior court abuses its discretion if it commits an error of law. *Twin City Fire Ins. Co. v.*

---

**3.** The Arizona Center for Disability Law filed an application for permission to file a brief as *amicus curiae* in this appeal. We grant the applica-

tion, but consider the brief only insofar as it directly relates to the issues raised on appeal and supported by the record.

*Burke,* 204 Ariz. 251, 254, ¶ 10, 63 P.3d 282, 285 (2003).

## B. The State's Defenses Do Not Bar Plaintiffs' Claims.

¶ 15 Before proceeding to the merits of the injunction, we first address and dismiss three arguments the State contends bar Plaintiffs' claims.

### 1. All but one of the Plaintiffs have standing to pursue injunctive relief.

¶ 16 The State argues first that Plaintiffs' claims should be dismissed for lack of standing. "Because the Arizona Constitution does not contain a provision analogous to the case or controversy requirement of the U.S. Constitution, 'we are not constitutionally constrained to decline jurisdiction based on lack of standing.'" *Bennett v. Napolitano,* 206 Ariz. 520, 527, ¶ 31, 81 P.3d 311, 318 (2003) (quoting *Sears v. Hull,* 192 Ariz. 65, 71, 961 P.2d 1013, 1019 (1998)). For reasons of judicial policy, however, Arizona courts nonetheless impose a "rigorous" standing requirement. *Fernandez v. Takata Seat Belts, Inc.,* 210 Ariz. 138, 140, ¶ 6, 108 P.3d 917, 919 (2005).

¶ 17 To establish standing, Plaintiffs must allege a "distinct and palpable injury." *Id.* The injury must be "particularized" and to the Plaintiffs "themselves." *Bennett v. Brownlow,* 211 Ariz. 193, 196, ¶ 17, 119 P.3d 460, 463 (2005). Here, because Plaintiffs seek to prevent a future injury from the budget measures, they must establish an "actual, concrete harm" that is not "merely some speculative fear." *See Klein v. Ronstadt,* 149 Ariz. 123, 124, 716 P.2d 1060, 1061 (App.1986).

¶ 18 We conclude Plaintiffs have established a threat of "actual, concrete harm" to all but one of them. First, each of the Plaintiff Providers will suffer a distinct and palpable injury from the 10 percent rate reductions the Division imposed. The Arizona Association of Providers for Persons with Disabilities ("AAPPD"), the organizational plaintiff, also has standing. All of its 82 provider-members share a common and equal injury as a result of the rate reductions. Although this economic injury will have varying repercussions for each provider, each member seeks the same remedy—to prevent enforcement of the rate reductions.

¶ 19 The State argues AAPPD may not sue in a representative capacity, citing *Home Builders Ass'n of Central Arizona v. Kard,* 219 Ariz. 374, 199 P.3d 629 (App.2008). *Kard* held an association lacked standing in a representative capacity in part because the damages claims of the individual members in that case required "mini-adjudications" which "would not advance judicial economy, one of the premises for allowing representational standing." 219 Ariz. at 378, ¶ 15, 199 P.3d at 633. No such "mini-adjudications" are required in this case, in which Plaintiffs seek injunctive relief.

¶ 20 Finally, all but one of the Plaintiff Beneficiaries established they will suffer a distinct and palpable injury from the budget measures.[4] Eric Hermon is a Medicaid-eligible beneficiary whose services and group home arrangement arguably will be affected by the Division's cost-cutting measures. Similarly, Plaintiffs E.K. and R.K. arguably will suffer a distinct and palpable injury from the Division's measures. They receive services from the Reeves Foundation, one of only two agency providers in Eagar, and will suffer a reduction in overnight ser-

---

4. Only Plaintiff Dominic Barreras lacks standing. Based on Barreras's testimony, it is not apparent how, or if, the measures at issue will affect his services. According to the record, Barreras receives state-only services and is dependent on a caregiver provided by ABRiO, his agency provider, for his food and medicine. Barreras testified his caregiver's hours were reduced from 40 hours per week to 4 hours per week, but this change occurred two months before the hearing, long before the cuts had been announced. Nothing in the record establishes the caregiver's change in hours was related to the service suspension or rate reductions. Additionally, Barbara Brent, the assistant director of the Division, testified Barreras was not going to lose his services and any change in his caregiver's hours was not related to the budget measures. Under these circumstances, Barreras may have a general objection to the budget measures, but he does not have standing to sue. *See Sears,* 192 Ariz. at 69, ¶ 16, 961 P.2d at 1017 ("allegation of generalized harm" not sufficient to confer standing).

vices and changes to their living arrangements as a result of the budget reductions.[5]

**2. The exhaustion doctrine does not bar Plaintiffs' claim for injunctive relief.**

¶ 21 The State also argues the superior court lacked jurisdiction because Plaintiffs failed to exhaust their administrative remedies. We disagree. Under the facts of this case, it would have been futile for Plaintiffs to seek administrative review. *See Zeigler v. Kirschner*, 162 Ariz. 77, 85–86, 781 P.2d 54, 62–63 (App.1989) ("It is settled in Arizona that the exhaustion doctrine is not to be applied ... where invoking the available administrative procedures would be futile or useless.").

¶ 22 The purpose of requiring a claimant to exhaust administrative remedies is to "allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Medina v. Ariz. Dep't of Transp.*, 185 Ariz. 414, 417, 916 P.2d 1130, 1133 (App.1995) (quotation omitted). This doctrine promotes judicial economy and administrative autonomy. *Moulton v. Napolitano*, 205 Ariz. 506, 511, ¶ 9, 73 P.3d 637, 642 (App.2003).

¶ 23 Here, given the timing, nature and severity of the expropriation the legislature imposed on DES through S.B. 1001, it would have been futile for Plaintiffs to seek an administrative remedy. Doing so under these circumstances would not have had "realistic potential as a means for seeking to induce [DES] to abandon or alter" its decision as to how to effect the required budget reductions. *See Zeigler*, 162 Ariz. at 86, 781 P.2d at 63. And even if Plaintiffs had sought administrative review, the individual facts of their particular grievances would not aid judicial economy or sharpen the legal issues this case presents. "There is nothing about the administrative process in this case that would be harmed, and nothing about the judicial process that would be helped, if exhaustion were required." *Bailey–Null v. Va-*

*lueOptions*, 221 Ariz. 63, 71, ¶ 26, 209 P.3d 1059, 1067, 2009 WL 922817, at *6 (App. April 7, 2009). Thus, the plaintiffs were not required to exhaust their administrative remedies before seeking judicial review.

**3. This Court has the power to review the legality of the legislature's reduction of the DES budget.**

¶ 24 Finally, we reject the State's argument that this Court lacks jurisdiction to review the DES budget reductions.

¶ 25 No serious contention can be made that a court cannot review an appropriation's legality. *See generally League of Ariz. Cities and Towns v. Martin*, 219 Ariz. 556, 558, ¶ 4, 201 P.3d 517, 519 (2009) (supreme court accepted special action jurisdiction to review the constitutionality of a section of a general appropriation bill); *Kromko v. Ariz. Bd. of Regents*, 216 Ariz. 190, 195, ¶ 24, 165 P.3d 168, 173 (2007) (supreme court specifically declined to hold that all funding decisions by other branches of government are insulated from judicial review) (internal quotation and citation omitted); *Hutchins v. Swinton*, 56 Ariz. 451, 456, 108 P.2d 580, 583 (1940) (supreme court interpreted intent of legislature's general appropriation bill); *Crane v. Frohmiller*, 45 Ariz. 490, 499, 45 P.2d 955, 959 (1935) (supreme court determined whether there was a valid appropriation from which the claims in question may be paid). "The only proper method for testing the legality or constitutionality of a legislative enactment, be it municipal, county or state, is by judicial review." *Citizens for Orderly Dev. & Env't v. City of Phoenix*, 112 Ariz. 258, 260, 540 P.2d 1239, 1241 (1975) (citation omitted).

**C. State Law Does Not Prohibit the Service Suspensions or Rate Reductions.**

¶ 26 Having disposed of the defenses the State raises to our consideration of the matter, we proceed to address the merits of the injunction the superior court entered. We

---

5. Although the State argues these changes were initiated before the budget measures were announced, Reeves's affidavit establishes the bud-

get measures will affect the Reeves Foundation's ability to provide services to R.K. and E.K.

do not disagree with Plaintiffs' contention that the DES service suspensions and rate reductions pose a great threat of irreparable harm to developmentally disabled Arizonans. Because we agree that such risk tips the balance of hardships sharply in favor of Plaintiffs, the dispositive issue is whether Plaintiffs presented "serious questions" of law going to the merits of their claims.

### 1. State law does not grant Plaintiff Beneficiaries an entitlement to the services set out in their Individual Support Plans.

¶ 27 By law, an Individual Support Plan ("ISP") is created for each developmentally disabled person served by the Division. The ISP is a "written statement of services to be provided to a person with developmental disabilities ... developed following [an] initial placement evaluation and revised after periodic evaluations." A.R.S. § 36–551(26) (Supp.2008). The law provides that developmentally disabled persons have the right to receive a placement evaluation and an ISP, A.R.S. § 36–551.01(G), (J) (2003), and the right to "periodic [ISP] evaluations." A.R.S. § 36–565(A) (2003).

¶ 28 Although Plaintiffs argue, and the superior court found, that an ISP creates an entitlement to the services specified in that document, we have found no legal authority establishing in the individual the right to receive services consistent with an ISP without regard to the State's ability to afford those services. To the contrary, a number of statutes in Title 36 make clear that the provision of any service is contingent on appropriations and other funding.[6]

¶ 29 Moreover, the fact that services may be suspended after a periodic review of an individual's needs, see A.R.S. § 36–565(B),

does not imply that services may not be suspended on a programmatic basis when necessitated by changes in funding. Simply put, under Arizona law, an ISP does not entitle a developmentally disabled person to services that the Division lacks the funds to provide.[7] Therefore, contrary to Plaintiffs' contention, state law does not render illegal the Division's decision to suspend state-only services to the developmentally disabled.

### 2. The rate reductions do not violate state law.

¶ 30 Plaintiffs argue, and the superior court found, that the Division did not follow the process set out in state law for modifying provider rates. In support of this argument Plaintiffs cite A.R.S. §§ 36–557(K) (Supp.2008) (the Division "shall establish a rate structure that ensures an equitable funding basis for private nonprofit or for profit agencies for [developmental disability] services") and 36–2959(A) (Supp. 2008) (DES "shall contract with an independent consulting firm for an annual study of the adequacy and appropriateness of title XIX reimbursement rates").

¶ 31 Although the cited provisions set out a process by which provider rates are evaluated regularly, they do not preclude DES or the Division from adjusting provider rates when a statewide fiscal emergency calls for it. See A.R.S. § 36–557(D) ("This article does not make [DES] or the state responsible for funding programs beyond the limits of legislative appropriation for the programs.").

### 3. The service suspensions and rate reductions do not violate Article III of the Arizona Constitution.

¶ 32 In the superior court, Plaintiffs argued in part that the legislature, through

---

6. *See, e.g.,* A.R.S. § 36–551.01(R) (developmentally disabled child's right to services is "subject to available appropriations"); A.R.S. § 36–552(C) (2003) (DES "shall provide" developmental disability services and programs "subject to annual legislative appropriation and other available funding"). The form ISP itself provides that "service decisions may require further approval, subject to [Medicaid] requirements or state funding."

7. Plaintiffs argued in the superior court that the State violated the Plaintiff Beneficiaries' rights by failing to provide notice and administrative review pursuant to Arizona law before suspending their services. On appeal, Plaintiffs do not argue that the failure to provide administrative review pursuant to Arizona law supports the preliminary injunction. In addition, the record does not show that any of the Plaintiff Beneficiaries sought but were denied administrative review of the threatened service suspensions. For these reasons, we do not address this issue.

its lump-sum budget reductions, improperly "delegated" to DES the responsibility for making specific cuts to the funding that previously had been appropriated for specific divisions and/or programs of DES, including those of the Division. They contended that such delegation violated Article III of the Arizona Constitution, the "separation of powers" provision. The superior court rejected this argument, holding instead that the legislature was not required to make such a detailed intra-agency breakdown under these circumstances.

¶ 33 On appeal, and in response to the opening brief, Plaintiffs again re-urge the Article III argument; however, they did not properly designate it as a cross-issue. *See* ARCAP 13(b). Nevertheless, both parties have to some extent briefed the issue, and in our discretion we will briefly address it.

¶ 34 We recognize that Arizona statutes provide some guidance for an orderly appropriations/budget process. *See* A.R.S. §§ 35–113, –116, and –122 (Supp.2008). Under these provisions, the power to appropriate funds is exclusively a legislative function. An appropriation is "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other." *Hunt v. Callaghan*, 32 Ariz. 235, 239, 257 P. 648, 649 (1927) (citations omitted). The appropriation process anticipates and accommodates fact-finding or other deliberative efforts that eventually lead to an appropriations bill that, when signed, becomes the working budget for the upcoming fiscal year. That months-long process took place during the first half of 2008, before the subject fiscal year began. The legislature's deliberative efforts eventually were memorialized in House Bill 2209 ("H.B. 2209"), which was enacted and signed by the Governor.

¶ 35 It is well-documented that state revenues necessary to sustain that working budget unfortunately did not materialize, leading to a severe budget crisis and a truly emergent situation that confronted the legislature in January 2009. Having considered and passed the original 2008–2009 budget, the legislature now was required to cut spending severely to make up for the revenue shortfall. As noted above, in S.B. 1001, the legislature enacted an "expropriation" bill, reducing, on an agency-by-agency basis, the level of state spending previously approved in H.B. 2209.

¶ 36 While Plaintiffs criticize the process and argue that in considering the expropriation bill the legislature should have engaged in a deliberative process identical to that utilized for the original appropriations bill— including detailed analysis and direction to each affected agency—they have provided no direct legal authority that mandates such an approach, and we have found none. Instead, faced with a sobering assessment of plummeting state revenue projections and having already done its due diligence with respect to agency funding needs prior to the start of the fiscal year, the legislature clearly acted within its proper authority when, first, it determined the overall reduction in state funding required to balance the existing budget, and second, it allocated such funding cuts on an agency-by-agency basis. *See Rios v. Symington*, 172 Ariz. 3, 6, 833 P.2d 20, 23 (1992) ("The Legislature, in the exercise of its lawmaking power, establishes state policies and priorities and, through the appropriation power, gives those policies and priorities effect.").

¶ 37 In *Rios*, the supreme court considered a constitutional challenge to the Governor's use of his line-item veto on an amended appropriations bill enacted to account for revenue shortfalls for the then-current fiscal year. *Id.* at 4–5, 833 P.2d at 21–22. In that decision, the court recognized that the power to appropriate funds and later to reduce that appropriation to account for revenue shortfalls was clearly within the purview of the legislature. *Id.* at 11, 833 P.2d at 28.

¶ 38 Here, having made the policy decisions relative to the funding reductions needed to balance the budget, the legislature also acted lawfully in directing each affected agency to allocate or otherwise determine how the reductions assigned to that agency would be absorbed. It is well established that an executive agency has discretion to allocate a lump-sum appropriation as it sees

fit. *Coleman v. Lee*, 58 Ariz. 506, 509, 121 P.2d 433, 435 (1942); *see also Anderson v. Lamm*, 195 Colo. 437, 579 P.2d 620, 623–24 (1978). The same discretion necessarily applies in implementing a mandated emergent budget reduction driven by unanticipated revenue shortfalls.

¶ 39 Those affected by agency decisions concerning the allocation of budget reductions may have some administrative or other legal recourse against the agency concerning the decision to eliminate, suspend or otherwise reduce services and benefits. However, that recourse may not, under these circumstances, be based on a contention that the legislature should have specifically directed or otherwise pre-empted the agency's decisions as to which programs or services to cut.

**D. No Substantial Evidence Supported the Conclusion that the Service Suspensions and Rate Reductions Threatened a Breach of Federal Law.**

¶ 40 As noted, the Division suspended state-only home-and-community-based services, that is, services funded by state monies and not required by federal law. Although the Division did not suspend any Medicaid services, it cut by 10 percent the rates it pays providers for Medicaid home-and-community-based services. In the superior court, Plaintiffs argued that because many providers of state-only services also deliver Medicaid services under contract with the Division, shutting down state-only services will reduce many Medicaid providers' revenues, causing them severe financial consequences. They contended that those consequences, when combined with the 10 percent rate reductions the Division imposed on the Medicaid providers, threatened to impair the "network" of providers of home-and-community-based Medicaid services to the developmentally disabled in Arizona. After hearing the evidence, the superior court agreed, concluding that the service suspensions and rate reductions likely would cause a violation of the State's obligations under Title XIX.

**1. The Division is obligated to ensure Medicaid services to qualified developmentally disabled persons.**

¶ 41 Although Arizona law does not guarantee services to the developmentally dis-

abled, federal law plainly provides such a guarantee to qualified developmentally disabled persons. Title XIX authorizes medical assistance to persons who are "age 65 or over, blind [or] disabled...." 42 C.F.R. § 430 (2009). As the entity charged with administering Arizona's participation in Medicaid, AHCCCS "decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures," all in accordance with federal law. *Id.; see also Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1493 (9th Cir.1997). The Arizona state plan provides for services to qualified individuals with disabilities in accordance with 42 C.F.R. § 435.121 (2009). *See* Arizona State Medicaid Plan at § 2.5(A) & Attachment 2.2–A, Item A.13.a, http://www.ahcccs.state.az.us/Publications/PlansWaivers/. Not surprisingly, in this appeal, the State concedes that the Division "cannot limit any of the services to [Medicaid]-eligible consumers that are mandated by the state plan."

¶ 42 Concerning Medicaid services for the developmentally disabled, the Division is a "managed care organization" ("MCO") that contracts with providers to deliver those services. *See* 42 U.S.C.A. § 1396u–2(1)(B). Federal law requires that as an MCO, the Division shall provide the State "with adequate assurances ... [that it] maintains a sufficient number, mix, and geographic distribution of providers of services." 42 U.S.C.A. 1396u–2(b)(5)(B). *See also* 42 U.S.C.A. 1396u–2(c)(1)(A)(i) (state that contracts with MCO must implement "[s]tandards for access to care so that covered services are available within reasonable timeframes and in a manner that ensures continuity of care and adequate primary care and specialized services capacity"). The corresponding federal regulation requires a state to ensure that the MCO "[m]aintains and monitors a network of appropriate providers that is ... sufficient to provide adequate access to all services covered under the contract." 42 C.F.R. § 438.206(b)(1) (2009). Significantly, the regulation also requires that "[i]f the network is unable to provide necessary services ... to a particular enrollee, [the MCO] must adequately and timely

cover these services out of network for the enrollee." 42 C.F.R. § 438.206(b)(4).

¶ 43 The contract between AHCCCS and the Division reflects these requirements. It requires the Division to provide certain services to the developmentally disabled and further provides that the Division "shall comply with all applicable Federal and State laws and regulations." AHCCCS/DDD Contract, *available at* http://www.ahcccs.state.az.us/ Contracting/ContractAmend/ALTCSCYE 2008/5–20–08DDDFinal.pdf, at 18, 93. More specifically, the contract requires:

> Provider networks must be a foundation that supports an individual's need as well as the membership in general. To that end, [the Division] shall develop, maintain and monitor a provider network, including home and community based service providers and alternative residential settings, that is supported by written agreements which is sufficient to provide all covered services to [qualified developmentally disabled recipients].... The [Division] must provide a comprehensive network to ensure its membership has access at least equal to, or better than community norms. Services shall be accessible to [Medicaid recipients] in terms of timeliness, amount, duration and scope as those are available to non-[Medicaid recipients] within the same service area.... If the network is unable to provide medically necessary services required under contract, the [Division] shall ensure timely and adequate coverage of these services through an out of network provider until a network provider is contracted.

*Id.* at 49.[8]

**2. Substantial evidence did not support the conclusion that the service suspensions and rate reductions will deprive developmentally disabled persons of Medicaid services.**

¶ 44 Plaintiffs' obligation at the preliminary injunction hearing was to demonstrate at least a serious legal question, as that term is used in the authorities cited above, ¶ 13, *supra,* that the service suspensions and rate reductions, separately or together, (1) would cause a breach of the Division's obligation to provide a "network of appropriate providers that is ... sufficient to provide adequate access to all services covered under the contract," and (2) that in such event, the Division would fail in its obligation to provide such services through out-of-network providers. *See* 42 C.F.R. § 438.206(b)(1), (4).[9]

¶ 45 The parties have not identified any case authority analyzing the facts required to prove a violation of the provider-network provisions of 42 U.S.C.A. § 1396u–2 or the corresponding regulations; nor have we found any. Analogous, however, are cases analyzing the "equal access" network provision contained in 42 U.S.C.A. § 1396a(30)(A), the comparable statute applicable to state Medicaid plans that do not use MCOs. That provision requires that under a state's network of Medicaid providers, "services are available ... at least to the extent that such care and services are available to the general population in the geographic area."

¶ 46 In *American Society of Consultant Pharmacists v. Garner,* 180 F.Supp.2d 953 (N.D.Ill.2001), pharmacies alleged a rate change violated the "equal access" requirement of 42 U.S.C.A. § 1396a(30)(A). *Garner,* 180 F.Supp.2d at 956. The uncontradicted evidence showed that the plaintiffs served 83 percent of a particular group of Medicaid recipients within the state. Id. at 957. The plaintiffs offered the opinion of an economist and detailed evidence by affidavits, again uncontradicted, of the financial effects of the new rate formula, including averments that "reductions in the announced reimbursement rates will make continued

---

8. The contract further requires that AHCCCS approve any "material change" to the provider network, which "is defined as one which affects, or can reasonably be foreseen to have an impact on more than 5% or more of the members and/or providers, the AHCCCS Program or may significantly impact the delivery of services by [the Division]." AHCCCS/DDD Contract, at 52–53.

9. There is a private cause of action under the Supremacy Clause of the United States Constitution for a violation of Title XIX's network requirements. *See, e.g., Indep. Living Ctr. of S. Cal., Inc., v. Shewry,* 543 F.3d 1050, 1062 (9th Cir.2008).

service at current levels to [certain Medicaid recipients] impossible." Id. at 964. Nevertheless, the court declined to enjoin the new rates because the evidence did "not clearly show" that the new formula would necessitate substantial cutbacks in services or would fail to attract "new pharmaceutical players to the table to provide services at the rates established by the new rule to compensate for any current providers who might reduce services or leave the program altogether." *Id.; see also Clark v. Richman,* 339 F.Supp.2d 631, 645–46 (M.D.Pa.2004) (plaintiffs' evidence of number of dentists in network and outside network was sufficient to defeat state's motion for summary judgment); *Clayworth v. Bonta,* 295 F.Supp.2d 1110, 1128 (E.D.Cal.2003) (evidence of "serious access problems" even before rate reduction, combined with "evidence of providers who will stop taking new [Medicaid] patients or stop serving [them] altogether" if rate reduction went into effect, constituted sufficient evidence to support injunction) *overruled on other grounds by* 140 Fed. Appx. 677 (9th Cir.2005).

¶ 47 The injunction the superior court entered in this case was based in large part on its conclusion that the service suspensions and rate reductions together would impair the provision of Medicaid services to the developmentally disabled. The court found the State had not "determined the financial ability of its private provider network to absorb both the loss of consumers and the rate reduction, and remain in business" and that this would likely cause "significant and lengthy interruptions in services" for some Medicaid beneficiaries. It further found the measures were "likely to cause numerous provider agencies to close programs or go out of business altogether, and to further reduce services as will have impact on all beneficiaries served, regardless of eligibility categories."

¶ 48 The majority of testimony at the hearing about Medicaid services threatened by the budget measures concerned Early Intervention Services ("EIS"), which are provided to developmentally disabled infants and toddlers. David Cutty, chief executive officer of The Centers for Habilitation, testified his organization serves about 92 children in its EIS program, of whom about a third are Medicaid recipients. Cutty testified the service suspensions and rate reductions would cause his organization to close its EIS program, with the result that his organization would no longer serve about 30 children receiving Medicaid services.[10] Cutty testified that one EIS provider in Maricopa County recently "closed primarily related to financial reasons" and another "would more than likely be closing down" its EIS program. Cutty admitted, however, that he had no "factual basis" to say whether any of the other EIS providers in Maricopa County would close or restrict intake of children because of the Division's budget measures.

¶ 49 Tamara Gallinger, a founding member of a provider called Family Partners, testified her organization serves 600 children in its EIS program, 150 of whom are Medicaid recipients. She testified Family Partners will close its EIS program due to the service suspensions (which affect the other 450 children in the Family Partners program who receive state-only services) and the rate reductions. Gallinger said there are "probably" about 12 EIS providers and that Family Partners serves "the majority" of the children who receive such services.[11] At one point in her testimony, Gallinger conceded the 150 children receiving Medicaid services from Family Partners could be served by other providers, but asserted it "would be devastating" to the children to switch from one provider to another. At another point, she observed that because of the cuts, "al-

---

**10.** The Centers for Habilitation also serves 600–650 adults, the majority of whom Cutty testified are Medicaid beneficiaries. Although Cutty listed several "impacts" the Division's measures would have on the adult services his organization provides, he did not testify that his organization intended to shutter those services.

**11.** It was not clear from Gallinger's testimony whether she was referring to the majority of children who receive such services in Maricopa County or the majority across the state. During oral argument, counsel for the State clarified that Gallinger's organization is the largest EIS provider in Maricopa County.

most every early intervention company is not going to continue."

¶ 50 No substantial evidence was offered at the hearing about the effect of the Division's service suspensions and rate reductions on Medicaid services other than EIS. At most, the evidence was that providers of other services would receive less revenue because of the rate reductions and for that reason would have to cut their own budgets and "reconfigure" services to stay in business. Thomas Schramski, the chief executive officer of MetroCare Services, testified that his company already had begun to lay off employees and some other providers would not be able to afford to continue to provide Medicaid services. This evidence failed to demonstrate the existence of a serious question that the service suspensions and rate reductions would cause the State to violate its obligations under federal law with respect to providing non-EIS Medicaid services to qualified developmentally disabled Arizonans.

¶ 51 Moreover, after closely reviewing the evidence and bearing in mind the analogous case authority, we conclude that substantial evidence did not support the conclusion that, even with respect to EIS, the Division's service suspensions and rate reductions were likely to substantially impair the provision of Medicaid services in violation of applicable federal law.

¶ 52 Taken together, the testimony of Cutty and Gallinger was that the Division's cuts would mean 180 children in Arizona no longer would be served by their existing Medicaid provider. Although Cutty and Gallinger testified that other EIS providers were failing or would fail, their statements to that effect were vague and conclusory. No evidence was offered of the total number of children who receive Medicaid EIS in Arizona or in Maricopa County. Also missing

was evidence of the number of organizations within the network of Medicaid EIS providers (Gallinger testified there were "about 12" EIS providers; left unstated was whether she was referring to in-network or out-of-network providers), and the number of EIS providers or potential EIS providers outside the current network.

¶ 53 Absent also, as in *Garner*, 180 F.Supp.2d at 964, was any evidence that other providers in the existing network would not take on children now served by The Centers for Habilitation or Family Partners or the other organizations that were said to be closing.[12] Moreover, and most significantly, Plaintiffs failed to offer any evidence that, if services could not be found within the Division's existing network of Medicaid providers, the Division would fail in its duty to serve Medicaid recipients through out-of-network providers. *See* 42 C.F.R. § 438.206(b)(4).

¶ 54 Plaintiff Beneficiaries and those who care for the developmentally disabled understandably seek to ensure that services to that vulnerable population continue without interruption. We also recognize that the abrupt nature of the service suspensions and rate reductions the Division imposed in February caused great alarm and dismay. Finally, we appreciate the difficulty of assembling and presenting evidence—on very short notice—to demonstrate facts to support the existence of serious legal questions as to whether the Division's decisions will cause the State to breach its obligations under federal law. We conclude, however, that the record before us at this time simply does not contain substantial evidence to support enjoining the Division's service suspensions or rate reductions.[13]

¶ 55 It bears repeating that, as stated above, Title XIX and our state plan, which

12. Cutty testified that in Maricopa County there are some 50 providers of services similar to those offered by The Centers for Habilitation, "including the individual therapy providers." He said he could not speak for those other providers about whether they could take emergency placements from his organization.

13. The superior court found that the Division's rate reductions were implemented in violation of

the notice-and-comment requirement imposed by federal law. That provision, however, does not apply to the home-and-community-based services. *See* 42 U.S.C.A. § 1396a(13)(A) (notice-and-comment applicable to rates paid for "hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded").

binds AHCCCS and, by contract, the Division, require the provision of services to qualified developmentally disabled persons. Those authorities compel the Division to ensure the continuation of those services, either inside the existing network of Medicaid providers or outside that network, notwithstanding the Division's decision to implement the budget measures at issue here. In the event that the service suspensions and rate reductions are shown to have impaired the network of Medicaid providers, and the Division fails to ensure the provision of services by out-of-network providers, Plaintiffs may return to court to present that evidence, in this litigation or another.[14]

### CONCLUSION

¶ 56 For the foregoing reasons, we order the injunction vacated and remand the matter to the superior court for further proceedings consistent with this opinion.

CONCURRING: DIANE M. JOHNSEN, Presiding Judge, LAWRENCE F. WINTHROP and PATRICIA K. NORRIS, Judges.

---

**14.** Although Plaintiffs argued a "takings" claim to a limited extent in the superior court, and on appeal, the superior court expressly made no finding as to the claim. Accordingly, any issue relative to such claim is not yet ripe for appellate review. *See Town of Gilbert v. Maricopa County,* 213 Ariz. 241, 244, ¶ 8, 141 P.3d 416, 419 (App. 2006) ("Ripeness is analogous to standing because the 'doctrine prevents a court from rendering a premature judgment or opinion on a situation that may never occur.'") (citation omitted).