ACCEPTED
15-24-00114-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/10/2025 4:31 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00114-CV

IN THE COURT OF APPEALS FOR THE FIFTEENTH DISTRICT OF TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/10/2025 4:31:15 PM
CHRISTOPHER A. PRINE
Clerk

**CECILE ERWIN YOUNG, IN HER OFFICIAL CAPACITY AS EXECUTIVE COMMISSIONER OF THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION, MOLINA HEALTHCARE OF TEXAS, INC., AND AETNA BETTER HEALTH OF TEXAS, INC.**
*Appellants,*

**v.**

**COOK CHILDREN'S HEALTH PLAN, TEXAS CHILDREN'S HEALTH PLAN, SUPERIOR HEALTHPLAN, INC., AND WELLPOINT INSURANCE COMPANY,**
*Appellees.*

On Appeal from the 455th Judicial District Court, Travis County, Texas
Cause No. D-1-GN-24-003839

**RULE 29.3 MOTION OF APPELLEES
COOK CHILDREN'S HEALTH PLAN AND TEXAS CHILDREN'S HEALTH PLAN**

# TABLE OF CONTENTS

Table of Contents ......................................................................................... ii

Table of Authorities ......................................................................................v

Relief Requested .......................................................................................... 1

Summary ...................................................................................................... 2

Factual and Procedural Background ............................................................. 8

    I.       The Children's Plans have been trusted partners to HHSC since
             the beginning of Medicaid managed care over two decades ago.........8

    II.      The challenged procurement sought to determine which
             Managed Care Organizations would administer STAR & CHIP
             for up to a decade or more....................................................................9

    III.     HHSC's STAR & CHIP procurement is unlawful.............................10

    IV.     The trial court signed a temporary injunction to prevent the
             Commissioner from executing the unlawful STAR & CHIP
             contracts.............................................................................................11

Argument.....................................................................................................14

    I.       Relief under Rule 29.3 is available to preserve the parties'
             rights pending appeal.........................................................................14

         A.      The requested injunction will preserve the status quo..............15

         B.      The requested injunction will safeguard the Court's
               jurisdiction and the Children's Plans' appellate rights............16

    II.      Irreparable injury to the Children's Plans and their employees
             and members is imminent. .................................................................19

         A.      Losing STAR & CHIP contracts will likely force the
               Children's Plans to shutter their operations............................19

          B.      Disruption or closure will cause job losses.............................20

C.      Current operations have already been and will continue to be compromised. ....................................................21

III.    Beneficiaries are also at risk of irreparable harm..............................23

      A.      Medical care will inevitably be disrupted.................................23

      B.      The Children's Plans are irreplaceable assets for their beneficiaries and communities..................................................25

IV.    Neither the Commissioner nor STAR & CHIP beneficiaries will be harmed by an injunction. ............................................................28

V.     The Children's Plans demonstrated both jurisdiction and a probable right to relief on their *ultra vires* claims. ............................30

      A.      A plaintiff establishes a valid *ultra vires* claim by showing that a state official acted without legal authority. ......30

      B.      A plaintiff may overcome a government official's plea to the jurisdiction by introducing evidence showing at least a fact question. .........................................................................31

      C.      Evidence presented at the hearing demonstrated that the Commissioner is conducting the STAR & CHIP procurement in an *ultra vires* manner.....................................333

            1.      No consideration or preference based on past performance or quality.................................................355

            2.      No preference for networks with Medicaid or charity-care providers. ..............................................388

            3.      No promotion of continuity of care or reduction of administrative and nonfinancial barriers. .......................38

            4.      No consideration of different plans for different populations.................................................................399

            5.      No evaluation and certification..................................399

            6.      Unlawful disclosure. ..................................................39

            7.      "Mandatory" CHIP contracts.......................................40

        8.      Unlawful STAR Kids procurement. ...............................40

Conclusion and Prayer ..........................................................................422

Certificate of Compliance .......................................................................44

Certificate of Conference .......................................................................44

Certificate of Service ............................................................................45

Appendix ...........................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott*,
645 S.W.3d 276 (Tex. 2022) ...............................................................14

*Amend v. Watson*,
333 S.W.3d 625 (Tex. App.—Dallas 2009, no pet.) ...........................15

*Ariz. Ass'n of Providers for Persons with Disabilities v. State*,
219 P.3d 216 (Ariz. App.—Div. 1 2009) .............................................25

*Bland Indep. Sch. Dist. v. Blue*,
34 S.W.3d 547 (Tex. 2000).................................................................31

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002).................................................................19

*Chambers-Liberty Cntys. Navigation Dist. v. State*,
575 S.W.3d 339 (Tex. 2019) .......................................................*passim*

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ...............................................................31

*Clayworth v. Bonta*,
295 F. Supp. 2d 1110 (E.D. Cal. 2003), *rev'd on other grounds*,
140 F. App'x 677 (9th Cir. 2005) ........................................................25

*Dallas Morning News v. Fifth Court of Appeals*,
842 S.W.2d 655 (Tex. 1992) (orig. proceeding) ...................................7

*Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*,
281 S.W.3d 215 (Tex. App.—Fort Worth 2009, pet. denied)...............20

*In re Geomet Recycling LLC*,
578 S.W.3d 82 (Tex. 2019) (orig. proceeding) .............................15, 17

*Hall v. McRaven*,
508 S.W.3d 232 (Tex. 2017) ...............................................................41

*Hous. Belt & Terminal Ry. Co. v. City of Houston*,
  487 S.W.3d 154 (Tex. 2016) ..............................................30, 31, 41

*Intercont'l Terminals Co. v. Vopak N. Am., Inc.*,
  354 S.W.3d 887 (Tex. App.—Houston [1st Dist.] 2011, no pet.)......................22

*Leddy v. Becerra*,
  617 F. Supp. 3d 116 (E.D.N.Y. 2022) ................................................28

*Methodist Hosps. of Dall. v. Tex. Indus. Accident Bd.*,
  798 S.W.2d 651 (Tex. App.—Austin 1990, writ dism'd w.o.j.) ........................15

*Muth v. Voe*,
  691 S.W.3d 93 (Tex. App.—Austin 2024, pet. filed) .........................................25

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
  992 F.2d 430 (2d Cir. 1993) .......................................................20

*In re Newton*,
  146 S.W.3d 648 (Tex. 2004) (orig. proceeding) ...................................15

*Patel v. St. Luke's Sugar Land P'ship, LLP*,
  445 S.W.3d 413 (Tex. App.—Houston [1st Dist.] 2013, pet.
  denied)..........................................................................32

*Pike v. Tex. EMC Mgmt., LLC*,
  610 S.W.3d 763 (Tex. 2020) .......................................................15

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
  862 F.3d 445 (5th Cir. 2017), *overruled on other grounds sub nom.*
  *Planned Parenthood of Greater Tex. Fam. Planning &*
  *Preventative Health Servs. v. Kauffman*, 981 F.3d 347 (5th Cir.
  2020) (en banc) .................................................................25

*Reata Constr. Corp. v. City of Dallas*,
  197 S.W.3d 371 (Tex. 2006) .......................................................30

*Smith v. Abbott*,
  311 S.W.3d 62 (Tex. App.—Austin 2010, pet. denied) ..................................18

*In re State*,
  711 S.W.3d 645 (Tex. 2024) (orig. proceeding) ..............................15, 32

*Tex. Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) ..............................................................32

*Tex. Dep't of State Health Servs. v. Holmes*,
294 S.W.3d 328 (Tex. App.—Austin 2009, pet. denied) ...................21

*In re Tex. Educ. Agency*,
619 S.W.3d 679 (Tex. 2021) (orig. proceeding) .......................6, 7, 15

*Tex. Educ. Agency v. Hous. Indep. Sch. Dist.*,
609 S.W.3d 569 (Tex. App.—Austin 2020, no pet.), *mand. denied
sub nom. In re Tex. Educ. Agency*, 619 S.W.3d 679 (Tex. 2021)
(orig. proceeding)..........................................................................16, 17

*TrueEX, LLC v. MarkitSERV Ltd.*,
266 F. Supp. 3d 705 (S.D.N.Y. 2017) ...........................................20, 21

*Universal Health Servs., Inc. v. Thompson*,
24 S.W.3d 570 (Tex. App.—Austin 2000, no pet.)............................29

*Walling v. Metcalfe*,
863 S.W.2d 56 (Tex. 1993) (per curiam)...........................................32

*Welch v. Brown*,
551 F. App'x 804 (6th Cir. 2014) ......................................................27

*Westheimer Indep. Sch. Dist. v. Brockette*,
567 S.W.2d 780 (Tex. 1978) ..............................................................18

*Wilson v. Cmty. Health Choice Tex., Inc.*,
607 S.W.3d 843 (Tex. App.—Austin 2020, pet. denied)
.............................................................................................7, 17, 18, 31

**Statutes**

TEX. CIV. PRAC. & REM. CODE § 65.011 .................................................15

TEX. GOV'T CODE § 22.221(a) ................................................................7

TEX. GOV'T CODE § 311.016(2) .............................................................33

TEX. GOV'T CODE § 533.002(1)(B).........................................................38

TEX. GOV'T CODE § 533.002(6)..............................................................38

vii

TEX. GOV'T CODE § 533.003(a)(3) ...................................................38, 39

TEX. GOV'T CODE § 533.0035(a) .........................................................39

TEX. GOV'T CODE § 536.052(d) ...........................................................37

TEX. GOV'T CODE § 2155.144(c) ..........................................................35

TEX. GOV'T CODE § 2155.144(d)(5) .....................................................35

TEX. HEALTH & SAFETY CODE § 62.155 ..............................................40

**Other Authorities**

1 TEX. ADMIN. CODE § 391.101(2) .......................................................39

1 TEX. ADMIN. CODE § 391.209(3)(A) ..................................................39

34 TEX. ADMIN. CODE § 20.208(d)(3) ...................................................40

Acts 2023, 88th Leg., R.S., Ch. 769, §1.01 ............................................37

Becky Staiger, *Disruptions to the Patient-Provider Relationship and
   Patient Utilization and Outcomes: Evidence from Medicaid
   Managed Care* ...................................................................................23

Tex. R. App. P. 29.3.............................................................................14

## RELIEF REQUESTED

Appellees Cook Children's Health Plan ("Cook Children's") and Texas Children's Health Plan ("Texas Children's," and together with Cook Children's, the "Children's Plans") request temporary relief under Texas Rule of Appellate Procedure 29.3 to preserve the status quo pending disposition of the interlocutory appeal filed by Appellant Cecile Erwin Young (the "Commissioner"), Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"), and by Molina Healthcare of Texas, Inc. ("Molina") and Aetna Better Health of Texas, Inc ("Aetna").[1]

In this litigation, the Children's Plans seek to prevent the Commissioner from awarding, signing, and implementing unlawfully procured Medicaid managed care contracts. Following a three-and-a-half-day evidentiary hearing, the trial court issued a temporary injunction prohibiting the Commissioner from moving forward with the procurement or contracts. The Commissioner's appeal has superseded the injunction, necessitating this motion to preserve the Court's jurisdiction and prevent irreparable harm to the Children's Plans, their members and employees, and more than 1.5 million vulnerable children and expectant mothers statewide.

---

[1] Molina and Aetna filed notices of appeal of the trial court's injunction, even though they were not parties to the trial court proceedings. Appellees have jointly moved to dismiss Molina's and Aetna's appeals for lack of jurisdiction.

On October 24, 2024, the parties entered into an agreement that obliges the Commissioner to comply with the temporary injunction—and continue to pause any further procurement, including awarding, executing, or implementing the unlawfully procured contracts—

> until the latest of (a) 30 days after the end of the 89th Regular Session of the Texas Legislature, regardless of the appellate court's ruling on the Joint Motion to Abate; (b) a ruling from the appellate court on any request for temporary orders under TRAP 29.3 filed within seven days of the Appeal's reinstatement; or (c) disposition of any mandamus proceeding in the Texas Supreme Court reviewing a ruling on a request described in (b) above, provided that the proceeding is filed within seven days of such ruling.

On October 29, 2024, the Commissioner and Appellees filed a joint motion to abate this appeal until 30 days after the end of the 2025 (89th) Regular Session of the Texas Legislature, which session ended on June 2, 2025. On November 12, 2024, this Court granted the motion, abating the appeal and stating that the appeal would be reinstated on July 3, 2025. On July 3, this Court reinstated the appeal.

Because this agreement prevents harm to the Children's Plans while the instant Rule 29.3 motion is pending, the Children's Plans do not seek expedited consideration and disposition of the motion.

## SUMMARY

The Commissioner is currently administering one of the largest procurements in Texas history—involving $10 billion annually and contracts for up to twelve years—which will determine the future of how healthcare is provided to millions of

the state's most vulnerable children and expectant mothers. These beneficiaries receive coverage through the Medicaid State of Texas Access Reform ("STAR") program and the Children's Health Insurance Program ("CHIP," and together with STAR, "STAR & CHIP").[2] HHSC is Texas's health regulatory agency in charge of administering the state's Medicaid and CHIP programs and administers those programs by contracting with managed care organizations ("MCOs") to coordinate and cover health-care services for STAR & CHIP beneficiaries.

The notice of intent to award contracts under HHSC's current STAR & CHIP procurement would, if finalized and implemented, inflict a seismic shift on the state's Medicaid landscape, eliminating the Children's Plans—high-performing, nonprofit plans that were developed at the Texas Legislature's behest to provide care to underprivileged women and children—and replacing them with lower-performing subsidiaries of large, national, for-profit companies. This shocking outcome resulted from an unlawful procurement that has defied statutory requirements and been

---

[2] In addition to STAR & CHIP, this procurement will also determine which managed care organizations will provide coverage under the Healthy Texas Women ("HTW") program. PX.38 at 5. STAR, CHIP, and HTW assist vulnerable Texans with their healthcare needs in different ways. STAR is a Medicaid managed care program that provides coverage to low-income children, pregnant women, and families. 6.RR.102-03. CHIP is not a Medicaid program: It provides low-cost health coverage for children (and unborn children of pregnant women) whose families earn too much to qualify for Medicaid but are unable to afford commercial health insurance. 6.RR.86, 103-104. HTW provides free women's health and family-planning services to eligible, low-income women between the ages of 15 and 44. PX.92 at 1-2. And STAR Kids—which is the subject of another ongoing and unlawful procurement—is a separate Medicaid program that provides healthcare benefits to children and young adults with disabilities. 6.RR.103.

marred by, among other things, HHSC's improper disclosure of competing bidders' proposals to Aetna—a successful bidder and putative intervenor in this appeal—during the evaluation process.

Once it became apparent that HHSC was disregarding numerous statutory directives, including requirements to consider and give preference for past performance and quality services in its evaluation process, the Children's Plans brought suit against the Commissioner for *ultra vires* acts in the agency's execution of the procurement. Two other MCOs also sued, and the four cases were consolidated. Discovery revealed additional evidence that HHSC is violating multiple statutory directives in determining which MCOs will be awarded STAR & CHIP contracts and is violating those same mandates in its ongoing procurement for STAR Kids, another Texas Medicaid program.

The Commissioner filed a plea to the jurisdiction seeking dismissal of the Children's Plan's claims, and the Children's Plans applied for temporary injunctive relief barring further *ultra vires* acts by the Commissioner. At the evidentiary hearing on the plea and applications, HHSC officials themselves provided proof of these *ultra vires* acts. They admitted that the applicable statutes were mandatory, and that the agency had no discretion whether to apply them. But they also conceded that the procurement was ***not*** designed to address the statutorily required considerations and preferences; the procurement ***did not*** ask bidders to provide

4

information on these considerations and preferences; the HHSC employees charged with evaluating and scoring the proposals *were not* told to apply these considerations and preferences; and the scoring forms *did not* identify these considerations or preferences, let alone assign them any weight or points. HHSC witnesses also confirmed that *no* document shows that any MCOs received the mandated preferences or that the statutory mandates were taken into account. In short, there is *no* evidence that these mandatory statutory preferences were applied—because they were not.

HHSC nevertheless contends that the required preferences and considerations were "baked into" the scores the MCOs received. But the only proof they offer is their own officials' *ipse dixit* that the required factors were considered and somehow reflected in the scores, even though those officials did not score the bids, have no personal knowledge of the evaluators' scoring decisions, and reviewed only the final scores themselves—not the underlying scoring materials.

For the Children's Plans, the harm caused by this illegal procurement is existential. Unlike for-profit, commercial insurance companies with large, diverse operations across Texas and the nation, the Children's Plans are local nonprofits that were created and currently exist *solely* to serve Medicaid- and CHIP-eligible children and pregnant mothers within the areas served by their respective children's hospitals. Consequently, loss of their STAR & CHIP contracts might cause the

Children's Plans to permanently dissolve; at a minimum, the consequences will be dire as each would likely lose most of their employees and revenue.

Medicaid beneficiaries themselves are also at significant risk of harm. The Children's Plans serve more than a half-million children and women—large portions of the STAR & CHIP enrollees in their respective service areas. If HHSC's *ultra vires* procurement is not enjoined, **all** of these vulnerable Texans will be forced to switch health plans, and many will need to find new healthcare providers and suffer delayed care. Statewide, more than *1.5 million* STAR & CHIP beneficiaries will have to move to new health plans. Such a large and unprecedented upheaval of the state's Medicaid program administration and reassignment of children and pregnant women will inevitably deprive some beneficiaries of longstanding, trusted provider relationships and interrupt their ongoing access to medical care.

Based on this evidence, the trial court denied the Commissioner's plea to the jurisdiction, which argued—incorrectly—that the Children's Plans had not demonstrated *ultra vires* acts. The trial court also issued temporary injunctive relief preventing the Commissioner from moving forward with the unlawful STAR & CHIP and STAR Kids procurements.

The Commissioner's appeal of the trial court's temporary injunction order automatically supersedes it. *See generally In re Tex. Educ. Agency*, 619 S.W.3d 679 (Tex. 2021) (orig. proceeding). Thus, absent action by this Court, the Commissioner

is poised to continue the procurement process, including awarding, signing, and implementing the unlawfully procured contracts before this Court decides the Commissioner's appeal, threatening irreparable harm to the Children's Plans, their employees and members, and STAR & CHIP beneficiaries across the state. Given the trial court's findings, the Children's Plans' probable right to relief on their claims, and the equities, the Children's Plans respectfully request that the Court exercise its authority under Rule 29.3 to issue a new order continuing the same temporary injunction the trial court issued on October 4, 2024 (which had remained in effect through the conclusion of the 2025 session of the Texas Legislature by agreement of the parties), pending disposition of this appeal. *See id.* at 689 n.57, 692 (court of appeals has authority under Rule 29.3 to issue "new order" continuing or maintaining injunction issued by trial court).

An injunction is also necessary to protect the Court's jurisdiction over this appeal. *See* TEX. GOV'T CODE § 22.221(a); *Dall. Morning News v. Fifth Ct. of Appeals*, 842 S.W.2d 655, 658 (Tex. 1992) (orig. proceeding). Maintaining the status quo would prevent the Commissioner from arguing that final awards or signed contracts render moot any challenges to the procurement, as HHSC contended in another case. *See Wilson v. Cmty. Health Choice Tex., Inc.*, 607 S.W.3d 843, 848 (Tex. App.—Austin 2020, pet. denied).

# FACTUAL AND PROCEDURAL BACKGROUND[3]

## I. The Children's Plans have been trusted partners to HHSC since the beginning of Medicaid managed care over two decades ago.

The Children's Plans are local, nonprofit health plans that provide services to STAR & CHIP and STAR Kids members as part of fully-integrated pediatric healthcare systems centered around world-renowned and highly ranked children's hospitals—Cook Children's Medical Center in Fort Worth and Texas Children's Hospital in Houston. As one of the nation's first MCOs focused solely on children and pregnant women, Texas Children's has participated in STAR & CHIP since the inception of Medicaid managed care in Texas and the State's adoption of CHIP. PX.161 at 234, CR.85. Founded in 1954, Texas Children's Hospital is the largest children's health system in the United States. CR.2279. Texas Children's longstanding affiliation with Texas Children's Hospital, Texas Children's Pediatrics, and the Baylor College of Medicine provides unique and critical access to some of the nation's leading experts for children and their mothers. CR.134-35.

Cook Children's Medical Center, the cornerstone of the larger Cook Children's healthcare system, has served Fort Worth families for over 100 years, and

---

[3] "CR.____" refers to the Clerk's Record in this appeal. "____.RR.____" refers to the volume and page of the Reporter's Record in this appeal. "PX.____" refers to the Plaintiffs' exhibits from the hearing on Plaintiffs' applications for temporary injunction, which may be found in Volumes 9-12 of the Reporter's Record.

Cook Children's has been integral to Texas Medicaid managed care for more than two decades. 8.RR.129-33.

Unlike large, for-profit plans, neither of the Children's Plans seeks to maximize market share across the state. 8.RR.132-33, CR.4035. Rather, each operates only within the geographic regions served by their respective affiliated hospitals—the Tarrant Service Area (Cook Children's) and the Harris and Jefferson Service Areas (Texas Children's). 8.RR.132-33, CR.4035.

## II. The challenged procurement sought to determine which MCOs would administer STAR & CHIP for up to a decade or more.

Following several failed STAR & CHIP procurements that were canceled due to pervasive scoring and process errors, HHSC spent significant time and State resources consulting with an outside firm, Mercer, to design a "defensible" procurement. 6.RR.136, 146, 196-97. As discussed below, however, HHSC officials ultimately ignored several of the specific recommendations made by Mercer to ensure that the STAR & CHIP procurement complied with Texas law. 5.RR.181; *see also infra* p. 35. The STAR & CHIP procurement, as designed and implemented, departed from prior procurements in several notable ways. The statutorily mandated consideration of past performance was removed, as were examinations of MCOs' provider networks and quality and cost-efficiency ratings, and the procurement included no analysis by region or service area. 5.RR.97, 221-28, 230-233, 254-56.

On December 7, 2022, HHSC announced the long-awaited new procurement, seeking MCOs to "provide, arrange, and coordinate preventive, primary, Acute Care, Behavioral Health, Non-Emergency Medical Transportation, and pharmacy Covered Services for pregnant women, newborns, children, and parents with limited income." CR.135. After receiving eighteen written proposals, HHSC undertook a three-step evaluation process: (1) initial screening to ensure that each proposal met submission requirements; (2) review and scoring by an "evaluation team" of HHSC employees; and (3) "consensus" scoring by which the MCOs' responses to technical questions were compared with HHSC-developed "Best Value Evaluation Criteria" and a scoring guide that assigned point values to each technical question. PX.38 at 21-22. After this evaluation, bidders within a "competitive range"—which ended up being *every* bidder—were invited to oral presentations. PX.38 at 23, PX.92 at 5. Final scores for each MCO's bid were then computed based on weighted scores for each of the technical questions and the oral presentations. 5.RR.208-09.

## III. HHSC's STAR & CHIP procurement is unlawful.

On March 7, 2024, HHSC issued a notice of intent to award for the STAR & CHIP procurement, announcing the health plans with which HHSC intended to contract to administer these programs for at least the next six—and potentially up to twelve—years. 5.RR.81, 203-04. The Children's Plans learned that, for the first time in program history, they ***would not*** receive STAR & CHIP contracts. Instead, their

10

respective service areas would be served almost exclusively by subsidiaries of large, national organizations—mostly for-profit—none of which has the Children's Plans' deep roots in their communities or longstanding commitment to the health of Texas's children and expectant mothers. CR.3310-11, 4718.

If HHSC's decision is implemented, every one of the approximately 420,000 Texas Children's members and 115,000 Cook Children's members in the STAR & CHIP programs will be forced to switch to a new health plan, one that is not part of a fully-integrated pediatric healthcare system. 8.RR.39, 133, 135. Many will also have to find new healthcare providers. 8.RR.22, 161. Statewide, more than 1.5 million STAR & CHIP beneficiaries will be forced to switch health plans. 5.RR.190, 6.RR.97-98, 7.RR.38.

## IV. The trial court signed a temporary injunction to prevent the Commissioner from executing the unlawful STAR & CHIP contracts.

Four MCOs filed suit: the two Children's Plans; Superior HealthPlan, Inc.; and Wellpoint Insurance Company. Each asserted *ultra vires* claims against the Commissioner and sought temporary relief to prevent her from awarding, signing, or implementing the contracts under the STAR & CHIP procurement. CR.3398, 3556¶169, 4234¶3, 4762-63¶170. In response, the Commissioner filed a plea to the jurisdiction seeking dismissal of the MCOs' claims. CR.2949-93. After consolidation of these suits, CR.2778, the Court allowed expedited discovery in

advance of an evidentiary hearing on the Commissioner's plea to the jurisdiction and the MCOs' applications for temporary injunction, CR.2786-97.

On October 4, 2024, following the hearing, the trial court entered an order denying the plea to the jurisdiction and granting the applications for temporary injunction. CR.5875-84 (App. Tab A). In its order, the trial court made findings that:

- The Commissioner "violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas, and that any award, execution, or implementation of Defendant's intended contract awards would be unlawful," CR.5877-78¶7;

- The Commissioner violated thirteen statutes, constitutional provisions, and administrative rules, *id.*;

- "These statutory and regulatory violations, each singly and together collectively, have resulted in intended contract awards that will be invalid and unlawful, and the further execution and implementation of such intended contract awards will be *ultra vires* acts," CR.5878¶8;

- Execution and implementation of the proposed contracts would imminently and irreparably harm the Children's Plans, "threaten[ing] Cook Children's financial viability" and potentially "lead[ing] to the [health plan's] forced wind-down" and "threatening the future viability" of Texas Children's Health Plan, CR.5879-80¶¶11-12;

- Execution and implementation of the proposed contracts would irreparably harm the public interest by "disrupt[ing]" STAR & CHIP beneficiaries' "access to care and continuity of care, thereby threatening the medical care and the very health and welfare of those beneficiaries," CR.5882-83¶18; and

- An injunction would not harm either HHSC or the public interest because "(1) operations under the intended contract awards are not scheduled to start until September 1, 2025, and (2) HHSC has

12

previously delayed the [procurement] several times and was able to continue providing coverage through the current STAR & CHIP contracts by extending the contracts in effect at the time," CR.5882¶17.

The trial court then ordered temporary injunctive relief against the Commissioner, enjoining her from

> awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP [procurement] or to further the procurement or contracting processes for the STAR & CHIP [procurement].

CR.5883.[4] On October 21, 2024, the Commissioner filed a notice of appeal challenging the trial court's rulings on both the plea to the jurisdiction and the applications for temporary injunction. CR.5957-60.

On November 12, 2024, the Court abated the appeal pending the conclusion of the 2025 (89th) Regular Session of the Texas Legislature. On July 3, 2025, the Court lifted the abatement and reinstated the appeal.

Before the appeal was abated, the Commissioner and Appellees entered into an agreement that obliges the Commissioner to comply with the temporary

---

[4] The trial court also made findings regarding the separate STAR Kids program, *see supra* note 2, for which HHSC is currently evaluating proposals. The trial court found that the STAR Kids procurement will be conducted in the same flawed manner as the STAR & CHIP procurement and "will therefore also violate statutory and regulatory requirements and be *ultra vires*." CR.5878-79¶9. Accordingly, the trial court also enjoined the Commissioner from "further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids" procurement. CR.5883.

injection (*i.e.*, pause execution and implementation of the STAR & CHIP contracts) while an appellate court considers any Rule 29.3 motion, under certain conditions. Specifically, the Commissioner must adhere to the trial court's injunction:

> until the latest of (a) 30 days after the end of the 89th Regular Session of the Texas Legislature, regardless of the appellate court's ruling on the Joint Motion to Abate; (b) a ruling from the appellate court on any request for temporary orders under TRAP 29.3 filed within seven days of the Appeal's reinstatement; or (c) disposition of any mandamus proceeding in the Texas Supreme Court reviewing a ruling on a request described in (b) above, provided that the proceeding is filed within seven days of such ruling.

Accordingly, because the agreement prevents harm while this Rule 29.3 motion is pending, expedited consideration of the motion is not necessary.

## ARGUMENT

### I. Relief under Rule 29.3 is available to preserve the parties' rights pending appeal.

"When an appeal from an interlocutory order is perfected, the appellate court may make any temporary orders necessary to preserve the parties' rights until disposition of the appeal." TEX. R. APP. P. 29.3. This Court therefore has the authority to issue an order continuing the trial court's temporary injunction, notwithstanding the State's automatic supersedeas right. *See In re Abbott*, 645 S.W.3d 276, 282 (Tex. 2022) ("[R]ule [29.3] may authorize a court of appeals 'to preserve the status quo and prevent irreparable harm' to the parties during the pendency of the appeal, even if the temporary order has 'the same practical effect as

denying supersedeas of the trial court's injunction.'" (quoting *Tex. Educ. Agency*, 619 S.W.3d at 680)). Indeed, "Rule 29.3 expressly contemplates that [relief to protect a party from irreparable harm] is directly available in the court of appeals." *In re Geomet Recycling LLC*, 578 S.W.3d 82, 89 (Tex. 2019) (orig. proceeding).

Because "[a] stay pending appeal is . . . a kind of injunction, [] the familiar considerations governing injunctive relief in other contexts [] generally apply in this context as well." *In re State*, 711 S.W.3d 641, 645 (Tex. 2024) (orig. proceeding). These considerations include an applicant's entitlement to relief and the imminent risk of irreparable injury. *See* TEX. CIV. PRAC. & REM. CODE § 65.011; *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 792 (Tex. 2020). The balance of harms and public interest are also relevant considerations. *See, e.g.*, *Amend v. Watson*, 333 S.W.3d 625, 630 n.4 (Tex. App.—Dallas 2009, no pet.); *Methodist Hosps. of Dall. v. Tex. Indus. Accident Bd.*, 798 S.W.2d 651, 660 (Tex. App.—Austin 1990, writ dism'd w.o.j.).

### A. The requested injunction will preserve the status quo.

Appellate courts have "great flexibility in preserving the status quo based on the unique facts and circumstances presented." *Geomet*, 578 S.W.3d at 89. The Texas Supreme Court defines "the status quo" as "the last, actual, peaceable, noncontested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding).

Here, the status quo is that the Commissioner has not yet awarded, signed, or implemented the unlawful STAR & CHIP contracts. In asking the Court to enjoin the Commissioner from awarding, signing, or implementing the intended contracts or otherwise effectuating the results of the procurement, the Children's Plans thus seek to preserve the state of affairs as it is today (and, indeed as it was when these consolidated lawsuits were filed).

Notably, the Commissioner acknowledged at the hearing that the alleged statutory violations are ongoing because the STAR & CHIP procurement has not yet been completed and she has put the process "on pause because of the court action." 6.RR.128-29. She further confirmed that, absent an injunction, she will proceed with further *ultra vires* acts. 6.RR.132, 147. ("[A]ssuming the Court will allow me to move forward, I would then finish the appeals process [and] move forward."). These statements confirm that the status quo for purposes of this litigation is the point in time before further actions that would consummate the award, execution and implementation of the STAR & CHIP contracts. Accordingly, for purposes of their *ultra vires* claims, the Children's Plans properly seek prospective relief.

**B.     The requested injunction will safeguard the Court's jurisdiction and the Children's Plans' appellate rights.**

Another purpose of "an appellate court's inherent power to make temporary orders" is "to preserve the parties' rights until disposition of the appeal." *Tex. Educ. Agency v. Hous. Indep. Sch. Dist.*, 609 S.W.3d 569, 578 (Tex. App.—Austin 2020,

no pet.), *mand. denied sub nom. In re Tex. Educ. Agency*, 619 S.W.3d 679 (Tex. 2021) (orig. proceeding). This function is especially crucial in cases like this given Rule 24.2's supersedeas effect on temporary injunctions; otherwise, "the application of Rule 24.2(a)(3) would prevent a party from ever meaningfully challenging acts by the executive branch that the party alleges to be both unlawful and reviewable by courts and that it further alleges will cause it irreparable harm." *Id.*; *see also Geomet Recycling*, 578 S.W.3d at 89 (observing that "serious constitutional questions" would be raised if appellee "had no recourse for the preservation of its rights during an interlocutory appeal").

HHSC's conduct in a prior procurement challenge suggests that, absent immediate intervention from this Court, the agency might argue that the Children's Plans will lose their ability to challenge the STAR & CHIP procurement. As recounted in *Community Health*, a health plan sued the Commissioner's predecessor in November 2019 following HHSC's announcement of intended awards, "asserting an ultra vires claim and seeking 'injunctive, mandamus, and declaratory relief.'" 607 S.W.3d at 848. The following month, in the midst of the litigation, the then-commissioner "executed and officially awarded the contracts . . . as planned"—and then "filed a 'supplemental plea to the jurisdiction' asserting that [the health plan's] claims, which sought to prevent the commissioner from awarding the contracts in violation of [state law], had become moot." *Id.* Ultimately, the appellate court did

not have occasion to decide whether the execution of the challenged contracts mooted the health plan's *ultra vires* claim because HHSC voluntarily cancelled the contracts during the pendency of the appeal. *See id.* at 848-49. But *Community Health* nevertheless underscores the risk that HHSC will take precipitous action in a bid to avoid judicial scrutiny if the Court does not grant this motion.

The Children's Plans do not agree that awarding, signing, or even beginning to implement the STAR & CHIP contracts would moot their claims. However, given past actions in similar circumstances, the Commissioner could try the same gambit, attempting to insulate the procurement from judicial review and seeking to deny the Children's Plans recourse by rejecting their internal appeals,[5] immediately executing the STAR & CHIP contracts, and then claiming mootness. To foreclose even the possibility of this unacceptable result and thus safeguard the Court's jurisdiction and the Children's Plans' appellate rights, immediate injunctive relief is needed.

---

[5] The Children's Plans note that, although their internal HHSC appeals are still pending with the Commissioner, that has no impact on their ability to obtain relief, as the *ultra vires* doctrine does not require exhaustion of administrative remedies. *See, e.g.*, *Smith v. Abbott*, 311 S.W.3d 62, 80 (Tex. App.—Austin 2010, pet. denied) (noting that "administrative exhaustion is not required" where declaratory judgment claims "allege acts *ultra vires* of [defendant's] statutory authority" (citing *Westheimer Indep. Sch. Dist. v. Brockette*, 567 S.W.2d 780, 789 (Tex. 1978))). Nor, in any event, would an exhaustion requirement be appropriate under these circumstances, since completion of the internal HHSC appeal process ***does not*** facilitate any further administrative action or a contested-case proceeding in state court.

Moreover, if HHSC is not enjoined and proceeds to award, sign, and begin implementing contracts during the pendency of this appeal, the Children's Plans will experience direct harm, as putative awardees will poach the Children's Plans' employees even before the new contracts go into effect—threatening their ability to continue servicing their members for the remaining term of their existing contracts. CR.3140-41; *see also infra* p. 22.

## II. Irreparable injury to the Children's Plans and their employees and members is imminent.

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). That standard is amply satisfied here.

### A. Losing STAR & CHIP contracts will likely force the Children's Plans to shutter their operations.

Because STAR & CHIP contracts are the linchpin of the Children's Plans' overall businesses, loss of those contracts poses an existential threat to the continued viability of each. 8.RR.35-36, 159.

The Children's Plans were founded in conjunction with Texas's rollout of Medicaid managed care and CHIP to partner with the State and ensure access to high-quality care for beneficiaries—and ***that is all they do***. 8.RR.36, 129-30, 176-77. They neither provide commercial insurance coverage nor participate in Medicaid

19

programs specific to adults. 8.RR.36; *see also* 8.RR.133. Moreover, although the Children's Plans operate STAR Kids programs, if they lose their STAR & CHIP contracts, they will lose the vast majority of their Medicaid members and most of their revenue—and will likely be unable to continue to operate. 8.RR.35-36, 39, 159-60. This is because STAR Kids is likely unsustainable if uncoupled from the much larger STAR & CHIP programs. 8.RR.39.

This threat of dissolution is alone sufficient to warrant immediate relief. *See, e.g.*, *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) ("Disruption to a business can be irreparable harm." (citations omitted)); *TrueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 727 (S.D.N.Y. 2017) ("[M]ajor disruption of a business can be as harmful as termination, and a threat to the continued existence of a business can constitute irreparable injury." (citation modified) (quoting *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993))).

### B. Disruption or closure will cause job losses.

If they lose their STAR & CHIP contracts, each Children's Plan will have to slash its workforce even if the plans survive. Texas Children's employs approximately 650 people, all of whom serve the STAR & CHIP and STAR Kids programs. 8.RR.35. Without its STAR & CHIP contracts, significant job losses are inevitable. 8.RR.40. Texas Children's employs many single mothers for whom job

loss will be especially traumatic, representing the loss of all household income, as well as generous benefits. *Id.*

Cook Children's employs approximately 375 people, 70% of whom serve STAR & CHIP members and would likely be let go if those contracts are not renewed. 8.RR.160-61. The remaining 30% focus on the separate STAR Kids program; they would also be at risk of termination because operating that plan alone might not be viable. 8.RR.159.

This risk of job losses for the Children's Plans' employees also constitutes irreparable harm and further justifies temporary injunctive relief. *See, e.g.*, *Tex. Dep't of State Health Servs. v. Holmes*, 294 S.W.3d 328, 334 (Tex. App.—Austin 2009, pet. denied) (affirming temporary injunction where applicant testified that, absent relief, "she would be forced to lay off employees and could potentially go out of business").

C. **Current operations have already been and will continue to be compromised.**

The Children's Plans are still under contract to provide STAR & CHIP services through at least August 31, 2026. But in the absence of an injunction, uncertainty about future contracts will likely cause current STAR & CHIP members to consider switching plans; indeed, before the trial court's injunction, some providers had already advised members to do just that. 7.RR.116-17.

Moreover, if new STAR & CHIP MCOs begin to ramp up operations in the Tarrant, Harris, and Jefferson Service Areas, they will likely poach the Children's Plans' experienced STAR & CHIP employees prior to the new contracts' go-live date—while the existing STAR & CHIP contracts are still in effect. CR.3140-41.

The mere indication, from the notice of intent to award, that the Children's Plans would be shut out of the new STAR & CHIP contracts immediately began disrupting their operations. For example, members and providers alike were confused about whether Cook Children's would continue to operate, requiring its staff to expend time and effort to clarify the impact of the announced procurement results. 8.RR.160. Cook Children's was also unable to hire a director of network management, a critical position, because multiple qualified candidates turned down the position to seek more stable opportunities elsewhere. *Id.* Texas Children's also has suffered and will continue to suffer disruptions in its workforce as its employees voice concern about their job security in light of the intended contract awards. CR.3140.

This disruption, uncertainty, delay, diminished customer service, and reputational injury all weigh in favor of immediate relief. *See, e.g.*, *Intercont'l Terminals Co. v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895-96 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

## III. Beneficiaries are also at risk of irreparable harm.

HHSC officials conceded that if the STAR & CHIP contracts are awarded as announced, more than 1.5 million Texans will be forced to switch health plans, and many of those will also have to find new healthcare providers. 5.RR.190, 6.RR.97-98, 7.RR.38-39. Texas Children's serves approximately 420,000 beneficiaries—more than 40% of beneficiaries in the Harris and Jefferson Service Areas. 8.RR.39; PX.38 at 29. Cook Children's serves 115,000 beneficiaries—approximately 40% of beneficiaries in the Tarrant Service Area. 8.RR.133; PX.38 at 29.

### A. Medical care will inevitably be disrupted.

These beneficiaries—some of Texas's most vulnerable children and expectant mothers—rely on the Children's Plans and their networks of providers for their health care. 8.RR.162. Because various MCOs' networks are not coextensive, some Medicaid members who are forced to change plans will lose access to primary care providers, specialty care providers, or both. For some, this disruption will occur as they are battling life-threatening illnesses and navigating the hardships of economic disadvantage and marginalization. Unsurprisingly, research demonstrates that forcing Medicaid beneficiaries to change providers has negative consequences: fewer primary care visits and increased hospitalizations for patients with chronic conditions. *See generally* Becky Staiger, *Disruptions to the Patient-Provider*

23

*Relationship and Patient Utilization and Outcomes: Evidence from Medicaid Managed Care*, 81 J. HEALTH ECON. 102574 (2022).

HHSC claims it will ensure continuity of care (which is, as discussed below, a statutory imperative, *see infra* pp. 38-39), by pointing to rules requiring that new plans cover care by existing providers for up to ninety days and honor prior authorizations for a set period of time. But these safeguards, while laudatory, sometimes fall short in practice because they depend on timely transfer of information between plans, which does not always occur—thus delaying and disrupting care even when a single beneficiary ***voluntarily*** changes plans. 8.RR.163, 174-75.

Moreover, these requirements do not protect beneficiaries in all circumstances. One stark example involves autism, which is diagnosed in roughly 4% of children statewide. 8.RR.13. Ashley Simms, Assistant Vice President of Nursing for Texas Children's, explained that applied behavioral analysis ("ABA"), a proven treatment for autism in children aged 3 to 5, requires a completed assessment before it is covered. *Id*. But this assessment has a waitlist of seventeen months, and because it is an assessment—not actual treatment—it is ***not*** covered by

HHSC's continuity-of-care rules. 8.RR.14.[6] As a result, a beneficiary on the waitlist who is forced to change plans may have to start "at the back of the line" on another provider's waitlist. *Id*. Thus, an involuntary change in health plan can delay, perhaps by many months, treatment for an autistic child. Worse, because ABA treatment loses efficacy after age 5, a delay of this sort might prevent a child from receiving the benefit of ABA treatment **altogether**. 8.RR.13-14. That too is irreparable harm. *See, e.g.*, *Muth v. Voe*, 691 S.W.3d 93, 109-18, 137-38 (Tex. App.—Austin 2024, pet. filed) (recognizing "the deprivation **or disruption** of medically necessary care" as irreparable harm (emphasis added)).[7]

B. **The Children's Plans are irreplaceable assets for their beneficiaries and communities.**

The Children's Plans are much more than insurance companies. Each is part of a nonprofit **integrated** pediatric healthcare organization—a single coordinated

---

[6] Likewise, HHSC's continuity-of-care rules do not apply to pregnancy care if the mother is at less than twenty-four weeks' gestation. 8.RR.23.

[7] *See also, e.g., Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 454 (5th Cir. 2017) (Medicaid beneficiaries had standing where challenged action would "deny them access to the healthcare services they seek"), *overruled on other grounds sub nom. Planned Parenthood of Greater Tex. Fam. Planning & Preventative Health Servs. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020) (en banc); *Clayworth v. Bonta*, 295 F. Supp. 2d 1110, 1116 (E.D. Cal. 2003) (beneficiaries had standing to challenge reimbursement-rate reduction where reduction would limit "the number of providers in the program [and thus] adversely affect beneficiaries' equal access to medical care and, quite possibly, its quality"), *rev'd on other grounds*, 140 F. App'x 677 (9th Cir. 2005); *Ariz. Ass'n of Providers for Persons with Disabilities v. State*, 219 P.3d 216, 223-24 (Ariz. App.—Div. 1 2009) (beneficiaries had standing where they would "suffer a reduction in overnight services and changes to their living arrangements as a result of [challenged] budget reductions").

system of providers, hospitals, and clinics ***all*** accountable for members' healthcare. 8.RR.18-19, 33, 129-30, 133-37. For beneficiaries, this integration brings highly coordinated care not available elsewhere, including:

- a single electronic medical records system;

- real-time sharing of information between providers and plan, facilitating beneficiary needs such as prior authorizations;

- an exceptionally robust network established over decades of service—including neighborhood health centers—and hundreds of millions of dollars annually in charity care; and

- services for which HHSC does not pay, including fresh groceries for high-risk pregnant women, transportation to government offices to apply for food stamps, and generators during severe weather events for patients reliant on equipment requiring electricity, such as ventilators.

8.RR.18-19, 33, 133-37.

This integration and focus make the Children's Plans qualitatively different from other MCOs. Their mission is to improve the health of their beneficiaries—not increase their own market shares. To that end, they operate only in the few service areas where their systems' hospitals, doctors, clinics, and other providers are located. They focus on the needs of beneficiaries even when it is unprofitable. And, when they have surpluses, they invest them back into their mission of providing needed services. The Children's Plans' demise would be a devastating loss to both their beneficiaries and their communities.

Notably, integrated healthcare organizations provide more efficient care, with higher patient satisfaction, than nonintegrated systems. 8.RR.34-35, 137-38. And no other integrated pediatric healthcare systems operate in the Children's Plans' service areas. 8.RR.135. As a result, if they are locked out of these contracts, each of the 500,000-plus members of the Children's Plans' would have to switch to a plan that is not part of a fully integrated pediatric healthcare system. *Id.*

Indeed, many members would have to switch to Molina, the MCO that scored highest in the STAR & CHIP procurement, even though, ***by HHSC's own admission***, Molina "does not meet quality of care measure minimum performance standards in any of the programs it operates in." 5.RR.262. Moreover, in the service areas that Texas Children's currently serves, Molina's quality metrics are lowest while Texas Children's boasts the highest. 8.RR.40-43.

Other winning bidders—BCBS of Texas and Aetna—also score low on statewide quality metrics. 8.RR.85-86. As the President of Texas Children's testified, "[f]or us to be told that we're not good enough to be part of the program . . . just doesn't make any rational sense. It certainly isn't what's best for Texas." 8.RR.44.

Courts have recognized the importance of "the public interest [] in . . . ensuring continuing health care to members of the public." *Welch v. Brown*, 551 F. App'x 804, 814 (6th Cir. 2014) (citation modified) (affirming preliminary

injection); *see also, e.g.*, *Leddy v. Becerra*, 617 F. Supp. 3d 116, 125 (E.D.N.Y. 2022) ("As the involuntary closure of the subject medical practice would severely, if not irrevocably, harm thousands of patients receiving medical care, the public interest overwhelmingly favors issuance of a TRO."). The public interest here weighs strongly in favor of emergency relief.

## IV. Neither the Commissioner nor STAR & CHIP beneficiaries will be harmed by an injunction.

In contrast to the significant irreparable harm to the Children's Plans, their employees, and their members if the procurement proceeds, no harm will result if the procurement is halted during the pendency of this appeal. In her plea to the jurisdiction, the Commissioner claimed that enjoining her from effectuating the procurement's awards would cause harm, stating, "Halting a state Medicaid program would be extremely disruptive to the current timeline that was carefully thought out to transition and protect continuity of care." CR.2990. At the hearing, however, she testified that she had already delayed the "current timeline" by eliminating the September 2025 projected start date. 6.RR.130. That start date "is no longer operative" and "is on pause." *Id*. As a result, there is no "current timeline" to disrupt—and thus no harm from disruption.[8]

---

[8] Any potential harm to Aetna and Molina is irrelevant because they are not proper parties to the appeal. *See* Appellees' Joint Motion to Dismiss. Even if they were proper parties and may be

28

The operative STAR & CHIP contracts have already been extended, maintaining the status quo for Medicaid beneficiaries. And, as HHSC's Deputy Executive Commissioner for Procurement and Contracting Services, Kay Molina, acknowledged, HHSC previously extended these contracts several times because prior procurements were canceled or delayed. 5.RR.180-81. In other words, these "bridge" contracts are already in force. 8.RR.96-97.

Moreover, the Commissioner and Appellees already agreed to maintain the injunction through the end of the 2025 regular legislative session and during the pendency of the Court's consideration of this motion. This further demonstrates that continuing to maintain the status quo during the pendency of this appeal will not inflict harm on HHSC or beneficiaries. Accordingly, the balance of harms overwhelmingly supports granting the Children's Plans' requested relief. *See Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App.—Austin

---

affected by the temporary-injunction order because it prevents the Commissioner from finalizing the procurement and executing any resulting contracts with Aetna and Molina while the appeal is pending, any such alleged potential harm to Aetna and Molina cannot and should not be the basis for permitting the Commissioner to continue to engage in *ultra vires* conduct while this Court considers the merits. This case and appeal is about the **Commissioner's** conduct. Thus, to the extent other entities may not gain a benefit while HHSC's procurement is paused, that should carry little, if any, weight in determining whether the Commissioner should be allowed to engage in unlawful conduct. Moreover, because Aetna and Molina did not attempt to intervene until after the case was already on appeal, they did not introduce any evidence of harm.

2000, no pet.) (courts "balance[] the equities of the parties and the resulting conveniences and hardships" when awarding injunctive relief).

## V. The Children's Plans demonstrated both jurisdiction and a probable right to relief on their *ultra vires* claims.

As reflected in the trial court's order, the Children's Plans presented overwhelming evidence that the Commissioner disregarded the law governing HHSC procurements. This more than satisfied their burden to create a fact issue on their *ultra vires* claims, thus defeating the Commissioner's plea to the jurisdiction. The same evidence also satisfied the Children's Plans' burden to show a probable right to relief on their *ultra vires* claims. *See Chambers-Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 349 (Tex. 2019) (recognizing that jurisdiction and merits often overlap factually).

### A. A plaintiff establishes a valid *ultra vires* claim by showing that a state official acted without legal authority.

Though sovereign immunity protects state agencies from liability, *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006), it "does not bar a suit that seeks to bring government officials into compliance with statutory or constitutional provisions," *Chambers-Liberty*, 575 S.W.3d at 348. This is the *ultra vires* exception to immunity. *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 157-58 (Tex. 2016).

30

"To fall within [the] *ultra vires* exception, a suit . . . must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). "[A] government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus ultra vires, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hous. Belt*, 487 S.W.3d at 158.

In a challenge to a state agency's procurement process, a plaintiff has "a cognizable ultra vires claim if it can establish that the" defendant's contracting decisions "exceeded the bounds of [their] authority or conflicts with the law itself." *Cmty. Health*, 607 S.W.3d at 851-52 (citing *Hous. Belt*, 487 S.W.3d at 158); *see also Chambers-Liberty*, 575 S.W.3d at 349 ("[I]mmunity only extends to those government officers who are acting consistently with the law.").

**B.    A plaintiff may overcome a government official's plea to the jurisdiction by introducing evidence showing at least a fact question.**

"A court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). When the plea to the jurisdiction implicates the merits of the plaintiffs' cause of action and includes evidence, the trial court reviews the relevant evidence

to determine if a fact issue exists, applying a summary-judgment standard. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). If the state asserts and supports with evidence that the trial court lacks jurisdiction, the plaintiff must show a disputed material fact regarding the jurisdictional issue. *Id*. at 228.

In addition to proving jurisdiction, evidence showing that a state official acted *ultra vires* supports a grant of injunctive relief. "Consideration of the merits of the parties' legal positions commonly informs a court's assessment of the advisability of injunctive relief." *State*, 711 S.W.3d at 645. Notably, however, "[t]he applicant [for injunctive relief] is not required to establish that he will prevail on final trial; rather, the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits." *Patel v. St. Luke's Sugar Land P'ship, LLP*, 445 S.W.3d 413, 419 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) (per curiam)); *see also State*, 711 S.W.3d at 645 ("The merits need not—and often should not—be definitively determined at this preliminary stage, but just relief that preserves the parties' rights cannot be afforded without some consideration of the merits.") (citation modified).

**C.** **Evidence presented at the hearing demonstrated that the Commissioner is conducting the STAR & CHIP procurement in an *ultra vires* manner.**

HHSC promised that the proposals responsive to the STAR & CHIP procurement would "be evaluated in accordance with [S]tate law, including, but not limited to, applicable provisions of Chapters 533, 536, and 2155 of the Texas Government Code." 6.RR.101. But HHSC did not honor that guarantee. Instead, the Commissioner's planning and implementation of the procurement has disregarded multiple statutory and regulatory requirements. Each of these statutes imposes a mandatory duty on the Commissioner by using the command "shall." *See* TEX. GOV'T CODE § 311.016(2) ("'Shall' imposes a duty."). Importantly, the Children's Plans do not contend that HHSC should have implemented these mandatory directives differently; rather, they alleged and have proved that HHSC and the Commissioner *did not implement them at all*. *See Chambers-Liberty*, 575 S.W.3d at 354 (government officials "do not have discretion to misinterpret state statutes constricting their authority").

Four senior HHSC officials testified at the hearing: Commissioner Young; Kay Molina, Deputy Executive Commissioner for Procurement and Contracting Services for HHSC; Emily Zalkovsky, State Medicaid Director; and James Ramirez, Director of Major Procurement, Medicaid Division. According to the Commissioner, Mr. Ramirez was the "point person" for the procurement. 6.RR.121.

33

These officials were well-aware of the statutory requirements and understood that they had no discretion to ignore them in this procurement. Indeed, the agency had implemented them in past STAR & CHIP procurements. But HHSC executives chose ***not*** to follow them this time because they viewed some as "antiquated" and others as "unfair" to new market entrants. 6.RR.176-77, 205-06.

Ignoring statutory directives is not within the Commissioner's discretion. *See Chambers-Liberty*, 575 S.W.3d at 354. If HHSC and the Commissioner had intended to implement these directives, they would have asked bidders to submit information relevant to the directives, instructed the evaluators to score that information, and included those directives on the procurement scoring sheet. The agency did ***none*** of these things. In fact, HHSC executives in charge of the procurement could identify ***no*** HHSC document showing which MCOs received or did not receive different scores due to any of the mandatory preferences or considerations—because none did.

Below is a recitation of key evidence the trial court heard regarding the Commissioner's multiple *ultra vires* acts in connection with the STAR & CHIP procurement. That evidence is more than sufficient to justify the trial court's disposition because it both (1) establishes a fact issue on *ultra vires* acts to support the trial court's denial of the Commissioner's plea to the jurisdiction and (2) establishes the Children's Plans' probable right to relief on their claims to

support the trial court's grant of a temporary injunction. At a minimum, such evidence easily supports granting the Children's Plans' Rule 29.3 motion pending this Court's disposition of the appeal.

### 1. No consideration or preference based on past performance or quality.

HHSC's express decision to ignore statutory directives is especially evident with regard to past performance. Two separate statutes require HHSC to take bidders' histories into account, but the agency disregarded both.

*First*, Texas Government Code Section 2155.144 requires that HHSC "***shall*** document that it considered all relevant factors" to ensure that "any procurement method approved by [HHSC] provides the best value" to the agency. TEX. GOV'T CODE § 2155.144(c) (emphasis added). One factor that HHSC must document is "indicators of probable vendor performance under the contract such as past vendor performance." *Id.* § 2155.144(d)(5). HHSC personnel admitted that past performance is a "relevant factor" to this procurement, but the agency failed to document that past performance was considered as required by Section 2155.144(c)—because it wasn't:

- HHSC expressly considered past performance during previous STAR & CHIP procurements. 5.RR.255-56.

- HHSC inexplicably rejected its hired consultant's recommendation to assign 10% of a bidder's score to past performance. 5.RR.181.

35

- Mr. Ramirez testified that past performance *is relevant* to the procurement and thus HHSC is required to document it, but the agency did not expressly document consideration of past performance. 5.RR.226-27.

- The STAR & CHIP procurement did not ask bidders to submit information on their past performances. 5.RR.227-28.

- Mr. Ramirez admitted that past performance "was not an express and independent consideration in this procurement"; that "there is no specific documentation showing the agency's consideration of relevant factors including past performance"; and that "the agency did not require the submission of past vendor performance." *Id.*; 5.RR.110-11.

- HHSC executives did not instruct evaluators to score past performance, and past performance was not included on the evaluators' score sheets. 5.RR.228-30.

Rather, HHSC evaluators were instructed to consider how respondents would perform *in the future* and did not "document anything about what [respondents] have done in the past or are presently doing." 5.RR.230. HHSC and the Commissioner thus failed to follow Section 2155.144's mandatory directive.

*Second*, the Commissioner disregarded the statutory requirement that HHSC "*shall* [] give preference to an organization that offers a managed care plan that successfully implements quality initiatives" or "meets quality of care and cost-

efficiency benchmarks." Tᴇx. Gᴏᴠ'ᴛ Cᴏᴅᴇ § 536.052(d) (emphasis added).[9] As

confirmed at the hearing:

- Ms. Molina and Mr. Ramirez conceded that this directive is mandatory. 5.RR.166, 223-24.

- Ms. Molina and Mr. Ramirez admitted that HHSC did not consider "quality of care and cost-efficiency benchmarks" at all in the procurement. 5.RR.197, 223-24.

- Ramirez admitted that "successfully implements quality initiatives" refers to existing or prior quality initiatives—not future initiatives. 5.RR.223-24.

- Nevertheless, the procurement did not ask bidders for data or evidence about successful implementation of existing or prior quality initiatives. 5.RR.101-03.

- Nothing in the evaluator training materials instructed evaluators "to give any of the statutory preferences or considerations at issue in this case." 5.RR.229.

- The scoring sheets do not mention this preference. 5.R.228-29, 233.

- Evaluators did not consider the extensive quality data HHSC has about bidders. 5.RR.230-31.

- Ms. Molina conceded that she cannot tell if the Children's Plans received this preference. 5.RR.105.

---

[9] Effective April 1, 2025, portions of Texas Government Code Chapter 533 were repealed and recodified as part of "the nonsubstantive revision of the health and human services laws governing the Health and Human Services Commission, Medicaid, and other social services." Acts 2023, 88th Leg., R.S., Ch. 769, §1.01. Section 536.052 has been recodified as Texas Government Code section 543A.0052. *Id.* Because the applicable statutes were in Chapter 533 at the time of the temporary-injunction hearing, and for consistency of reference, this brief will cite to the statutes as they existed at the time of the hearing.

## 2. No preference for networks with Medicaid or charity-care providers.

Texas Government Code Section 533.003 requires that HHSC "***shall*** give preference to organizations that have significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients." TEX. GOV'T CODE § 533.003(a)(1) (emphasis added).[10] But HHSC executives admitted that: (1) the STAR & CHIP procurement did not ask bidders to provide information about charity care providers in their ***existing*** networks, 5.RR.95-96; (2) the evaluators' scoring sheets make no mention of this preference, 5.RR.228, 233; and (3) it was unknown whether the Children's Plans received preferences under this statute. 5.RR.100. Additionally, none of these considerations was evaluated on a region-by-region basis as mandated. 5.RR.97.

## 3. No promotion of continuity of care or reduction of administrative and nonfinancial barriers.

Texas Government Code Section 533.002 requires that HHSC "***shall*** . . . promote continuity of care" and "reduce[] administrative and other nonfinancial barriers for recipients." TEX. GOV'T CODE § 533.002(1)(B), (6) (emphasis added). But HHSC executives testified that they affirmatively decided ***not*** to consider the

---

[10] Section 533.003 was recodified as Texas Government Code section 540.0204.

38

more than 1.5 million Texans who would need to switch health plans—and possibly healthcare providers as well. 5.RR.190; 6.RR.97-98; 7.RR.38-39.

### 4. No consideration of different plans for different populations.

Texas Government Code Section 533.003 requires that HHSC "***shall*** consider the need to use different managed care plans to meet the needs of different populations." TEX. GOV'T CODE § 533.003(a)(3) (emphasis added). But HHSC executives conceded that the procurement was conducted in a statewide manner that did not consider the needs of different populations within Texas. 5.RR.166; 6.RR.64-66, 93-96.

### 5. No evaluation and certification.

Texas Government Code Section 533.0035 requires that HHSC "***shall*** evaluate and certify that [MCOs are] reasonably able to fulfill the terms of the contract, including all requirements of applicable federal and state law." TEX. GOV'T CODE § 533.0035(a) (emphasis added). But HHSC executives admitted that the agency allowed bidders to self-certify and did not verify or evaluate these self-certifications. 5.RR.272-74.

### 6. Unlawful disclosure.

Texas law requires HHSC to conduct procurements in a fair and consistent manner. *See* 1 TEX. ADMIN. CODE §§ 391.101(2), 391.209(3)(A). It also generally prohibits agencies from "disclos[ing] information derived from proposals . . . to any

competing respondent prior to award or cancellation of [a] solicitation." 34 TEX. ADMIN. CODE § 20.208(d)(3). But HHSC executives acknowledged that one bidder, Aetna, received the other bidders' proposals while the STAR & CHIP procurement process was ongoing and before scoring began. 5.RR.137-40.

### 7.    "Mandatory" CHIP contracts.

Although Medicaid programs like STAR are subject to mandatory contracting requirements, *see* TEX. GOV'T CODE §§ 2155.44, 533.004,[11] these mandatory contracts do not apply to ***non***-Medicaid programs like CHIP, *see* TEX. HEALTH & SAFETY CODE § 62.155. But HHSC executives nevertheless confirmed their intention to award "mandatory" CHIP contracts. 5.RR.111, 118; 6.RR.50, 59.

### 8.    Unlawful STAR Kids procurement.

Finally, the Commissioner is continuing to commit similar *ultra vires* acts in connection with the ongoing STAR Kids procurement, which she intends to implement in the same unlawful manner as the STAR & CHIP procurement.

*      *      *

The evidence—both HHSC's produced documents and the testimony of HHSC officials—confirms that the Commissioner has disregarded and continues to disregard numerous ***mandatory*** statutory criteria in administering the STAR & CHIP

---

[11] Section 533.004 was recodified as Texas Government Code § 540.0206.

procurement. When the Commissioner "misinterpret[s] the limits" of these procurement statutes and regulations, she "misinterpret[s] the bounds of [her] own authority—exceeding the scope of what [Texas law] permit[s her] to do." *Hall v. McRaven*, 508 S.W.3d 232, 241-42 (Tex. 2017). Accordingly, by exercising her "*limited* discretion . . . in conflict with the constraints of the law authorizing [her] to act," *Hous. Belt*, 487 S.W.3d at 163, the Commissioner has committed *ultra vires* acts in conducting the STAR & CHIP procurement (and the ongoing STAR Kids procurement) and will continue to commit *ultra vires* acts if she is permitted to finalize the procurement by awarding, signing, and implementing the intended contracts.

By contrast, the Commissioner will be hard-pressed to identify ***any*** evidence that HHSC fulfilled its statutory obligations in the STAR & CHIP procurement. Indeed, there is no dispute about the lack of any documentation showing that the agency complied with the aforementioned statutory considerations and preferences. HHSC officials tried to brush that evidentiary lacuna aside, testifying that fulfillment of the statutory requirements was somehow "baked in" to the bidders' scores—but that explanation defies logic and the evidentiary record. And it is certainly insufficient to satisfy the Commissioner's burden to show that there is no fact issue on her *ultra vires* conduct.

## CONCLUSION AND PRAYER

As the trial court correctly concluded, the Children's Plans demonstrated their entitlement to immediate injunctive relief. Although the Commissioner's appeal of the temporary injunction superseded that order, Rule 29.3 allows this Court to issue a new, equivalent injunction to preserve the Children's Plans' rights during the pendency of the appeal. An injunction would also protect this Court's jurisdiction by preventing any argument about mootness.

Given the Children's Plans' probable right to relief, the imminent risk of irreparable harm to themselves and their employees and members, and the public interest in ensuring consistent, quality healthcare for vulnerable Texans, the Children's Plans respectfully request that the Court grant the Children's Plans' motion for temporary relief under Rule 29.3 and issue a new injunction continuing or maintaining the trial court's temporary injunction preventing the Commissioner from awarding, signing, or implementing contracts with the intended STAR & CHIP awardees and from otherwise moving forward with the unlawful STAR & CHIP and STAR Kids procurements, to remain in effect until disposition of this appeal. The Children's Plans further request all other relief to which they are entitled.

Respectfully submitted,

/s/ *Susan Feigin Harris*
Susan Feigin Harris
susan.harris@nortonrosefulbright.com
Warren S. Huang
warren.huang@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US, LLP
1550 Lamar, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151

Paul Trahan
paul.trahan@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US, LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone: (512) 474-5201

Thomas A. Coulter
tom.coulter@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US, LLP
799 9th Street, NW, Suite 1000
Washington, D.C. 20001
Telephone: (202) 662-0200

Jeff J. Wurzburg
Jeff.wurzburg@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US, LLP
Texas State Bar No. 24105140
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 224-5575

**COUNSEL FOR PLAINTIFF TEXAS
CHILDREN'S HEALTH PLAN**

/s/ *Amy Warr*
Amy Warr
State Bar No. 00795708
awarr@adjtlaw.com
Anna M. Baker
State Bar No. 00791362
abaker@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON
LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

Karen C. Burgess
kburgess@burgesslawpc.com
Katie Dolan-Galaviz
kgalaviz@burgesslawpc.com
BURGESS LAW PC
404 West 13th Street
Austin, Texas 78701-1825
Telephone: (512) 482-8808

Matthew P. Gordon
(pro hac vice motion forthcoming)
mgordon@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: (206) 359.8000

**COUNSEL FOR PLAINTIFF COOK
CHILDREN'S HEALTH PLAN**

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I certify that this motion contains 9,667 words, excluding the contents listed in Rule 9.4(i)(1).

/s/ *Amy Warr*
Amy Warr

## CERTIFICATE OF CONFERENCE

Pursuant to Texas Rule of Appellate Procedure 10.1(a)(5), I certify that, on July 9, 2025, I conferred with the following counsel:

- William Cole, counsel for the Commissioner, stated his client is opposed to this motion.

- Rich Phillips, counsel for Appellee Superior Health Plan, and Robert F. Johnson, III, counsel for Appellee Wellpoint Insurance Company, stated their clients support this motion.

- Joseph R. Knight, counsel for Aetna Better Health of Texas, Inc., stated his client is opposed to this motion.

- Jason LaFond, counsel for Molina Healthcare of Texas, Inc., stated his client is opposed to the motion but does not intend to file any opposition at this time.

/s/ *Amy Warr*
Amy Warr

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2025, a true and correct copy of this motion, including any and all attachments, was served via electronic service through eFile.TXCourts.gov on all parties through counsel of record, listed below:

Ken Paxton
Attorney General of Texas
Brent Webster
First Assistant Attorney General
William R. Peterson
Solicitor General
William F. Cole
Principal Deputy Solicitor General
State Bar No. 24124187
William.Cole@oag.texas.gov
Cory A. Scanlon
Assistant Solicitor General
State Bar No. 24104599
Cory.Scanlon@oag.texas.gov
Thomas Bevilacqua
Assistant Attorney General
Jennifer Cook
Assistant Attorney General
Stephanie A. Criscione
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 Capitol Station
Austin, Texas 78711-25848
Telephone: (512) 475-4104
Facsimile: (512) 320-0667

**COUNSEL FOR APPELLANT CECILE ERWIN YOUNG, IN HER OFFICIAL CAPACITY AS EXECUTIVE COMMISSIONER OF THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION**

Rich Phillips
rich.phillips@hklaw.com
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201

Theresa Wanat
theresa.wanat@hklaw.com
HOLLAND & KNIGHT, LLP
811 Main Street, Suite 2500
Houston, Texas 77002
Telephone: (713) 821-7000

Karen D. Walker
karen.walker@hklaw.com
HOLLAND & KNIGHT, LLP
315 S. Calhoun Street, Suite 600
Tallahassee, Florida 32301
Telephone: (850) 425-5612

James E. Cousar
james.cousar@hklaw.com
HOLLAND & KNIGHT, LLP
98 San Jacinto Blvd
Austin, Texas 78701
Telephone: (512) 469-6112

**COUNSEL FOR APPELLEE SUPERIOR HEALTH PLAN, INC.**

Robert F. Johnson III
rjohnson@foley.com
FOLEY & LARDNER, LLP
600 Congress Avenue, Suite 3000
Austin, Texas 78701
Telephone: (512) 542-7000

Michelle Y. Ku
mku@foley.com
Brantley A. Smith
bsmith@foley.com
FOLEY & LARDNER, LLP,
2021 McKinney, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000

Benjamin J. Grossman,
bjgrossman@foley.com
FOLEY & LARDNER, LLP
106 E. College Ave., Suite 900,
Tallahassee, Florida 32301
Telephone: (850) 222- 6100

**COUNSEL FOR APPELLEE WELLPOINT INSURANCE COMPANY F/K/A AMERIGROUP INSURANCE COMPANY**

Joseph R. Knight
jknight@ebbklaw.com
EWELL, BROWN, BLANKE & KNIGHT LLP
111 Congress Ave., 28th Floor
Austin, Texas 78701
Telephone: (512) 770-4010

**COUNSEL FOR AETNA BETTER HEALTH OF TEXAS, INC.**

Cheryl Joseph LaFond
clafond@scottdoug.com
Jason R. LaFond
jlafond@scottdoug.com
SCOTT, DOUGLAS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
Telephone: (512) 495-6300

**COUNSEL FOR MOLINA HEALTHCARE OF TEXAS, INC.**

/s/ *Amy Warr*
Amy Warr

| App. No. | Description |
|----------|-------------|
| A. | Temporary Injunction and Order Denying Defendant's Plea to the Jurisdiction (10.04.2024) |

# Appendix A

CAUSE NO. D-1-GN-24-003839

| | | |
|---|---|---|
| COOK CHILDREN'S HEALTH PLAN; TEXAS CHILDREN'S HEALTH PLAN; SUPERIOR HEALTHPLAN, INC.; and WELLPOINT INSURANCE COMPANY, | § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| CECILE ERWIN YOUNG, in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission, | § § § § § § | |
| Defendant. | § § | 353rd JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION AND ORDER DENYING DEFENDANT'S PLEA TO THE JURISDICTION

Before the Court are the Applications for Temporary Injunction (the "Applications") filed by Plaintiffs Cook Children's Health Plan ("Cook Children's"), Texas Children's Health Plan ("TCHP"), Superior HealthPlan, Inc. ("Superior"), and Wellpoint Insurance Company ("Wellpoint," and collectively, "Plaintiffs"); and the Plea to the Jurisdiction (the "Plea") filed by Defendant Cecile Erwin Young ("Defendant"), in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). After considering Plaintiffs' Applications and Defendant's response; Defendant's Plea and Plaintiffs' responses; the pleadings and attached evidence in these consolidated cases (Nos. D-1-GN-24-003839, D-1-GN-24-003874, D-1-GN-004059, and D-1-GN-24-004327); the parties' prehearing briefing; the evidence admitted in the record and adduced at the hearing held on September 30, October 1, October 2, and October 4, 2024; applicable authorities; the arguments of counsel, and all other matters properly before the Court, the Court DENIES Defendant's Plea and GRANTS Plaintiffs' Applications.

Copy from re:SearchTX

7. Specifically, Plaintiffs have established that Defendant has violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas, and that any award, execution, or implementation of Defendant's intended contract awards would be unlawful, because:

- Defendant's intended contract awards will fail to give preference to managed care organizations ("MCOs") that have significant participation in their provider networks from each healthcare provider in the region who has traditionally provided care to Medicaid and charity care patients as required by Texas Government Code § 533.003(a)(1);

- Defendant's intended contract awards will fail to give preference to MCOs that have successfully implemented quality initiatives as required by Texas Government Code § 536.052(a) and (d);

- Defendant has failed to develop and implement the cost-efficiency and quality of care benchmarks mandated by Texas Government Code § 536.052(b) despite being subject to an obligation to do so for over a decade. Defendant's intended contract awards will likewise fail to give preference to MCOs that have met such benchmarks as required by Texas Government Code § 536.052(d);

- Defendant's intended contract awards will fail to consider MCOs' past performances as required by Texas Government Code § 2155.144;

- Defendant's intended contract awards will fail to evaluate and certify that MCOs are reasonably able to fulfill the terms of the STAR contract as required by Texas Government Code § 533.0035 and to review MCOs to confirm their ability to fulfill the requirements of the CHIP contract as required by Texas Health & Safety Code § 62.051(e);

- In August 2023 and again in October 2023, Defendant wrongfully disclosed the RFP proposals of Plaintiffs and other respondents—with the August disclosure recipients including legal counsel for Aetna, one of the competing respondents, while the procurement was ongoing and prior to completion of the oral presentations—thus, destroying any integrity of the procurement process and creating an unlevel playing field that cannot ensure fair consideration of all proposals and is far from consistent, uniform, and transparent as required by 1 Texas Administrative Code §§ 391.101 and 391.209;

- Defendant's intended contract awards will fail to implement the Medicaid managed care program in a manner that improves the health of Texans by promoting

continuity of care and provides a medical home for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to reduce administrative and other nonfinancial barriers for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to consider the need to use different managed care plans to meet the needs of different populations as required by Texas Government Code § 533.003(a)(3);

- Defendant's intended contract awards will unlawfully award mandatory CHIP contracts to MCOs to which Defendant intends to award mandatory STAR contracts in violation of Texas Health and Safety Code §§ 62.055 and 62.155;

- Defendant's intended award of mandatory CHIP contracts will fail to give consideration to statutorily required factors, including those under Texas Government Code § 533.003, in violation of Texas Government Code § 533.004(a);

- Defendant's continuing practice of denying relevant information about a procurement to bidders until after the deadline to submit a bid protest violates the Due Course of Law provision of Article I, Section 13 of the Texas Constitution by not providing a meaningful bid protest process after promising one in 1 Texas Administrative Code Chapter 391; and

- Defendant's continuing practice of refusing to consider as untimely any information submitted in supplemental protests and/or after the protest filing deadline is inconsistent with the procedural protections promised to protestants in bid protest rules that require consideration of a protest or appeal submitted after the filing deadline when good cause for delay is shown under 1 Texas Administrative Code § 391.307(d)(1).

8. These statutory and regulatory violations, each singly and together collectively, have resulted in intended contract awards that will be invalid and unlawful, and the further execution and implementation of such intended contract awards will be *ultra vires* acts.

9. Furthermore, Defendant is currently evaluating bids for STAR Kids, a separate Texas Medicaid managed care program, through Request for Proposals No. HHS0013071 (the "STAR Kids RFP"). The procurement processes in the STAR & CHIP RFP and the STAR Kids RFP are substantively identical. Plaintiffs have demonstrated that Defendant has no intention of

voluntarily correcting her course of action for future procurements, including altering the processes and procedures used in administering the STAR Kids RFP. The resulting STAR Kids contract awards will therefore also violate statutory and regulatory requirements and be *ultra vires*.

10. Plaintiffs have established a probable right to relief and that Defendant's award, execution, and implementation of the intended, unlawfully procured STAR & CHIP contracts will, if not enjoined, cause Plaintiffs to suffer imminent and irreparable injury.

11. Cook Children's has established that execution and implementation of the contracts would result in irreparable harm to Cook Children's because:

- The loss of STAR & CHIP contracts threatens Cook Children's financial viability and might lead to the forced wind-down of the entity;

- Cook Children's participation in the STAR Kids program is in jeopardy because the larger STAR & CHIP contracts provide economies of scale to limit losses from STAR Kids;

- Cook Children's 100,000-plus STAR & CHIP members will be forced to change to different health plans from different companies, risking disruption to the members' healthcare and their access to their current primary care providers, specialty care providers, or both;

- Cook Children's has suffered immediate operational disruptions, including hiring difficulties and the delay of needed internal projects;

- Cook Children's can no longer negotiate a new pharmacy benefits contract alongside other Texas-only Medicaid plans and consequently will need to pay more for pharmaceuticals;

- Cook Children's 375 employees are at risk of losing their jobs—both the 70% of employees who focus on STAR & CHIP and the 30% who focus on STAR Kids; and

- New STAR & CHIP entrants in the Tarrant Service Area will likely poach Cook Children's experienced employees before the new contracts go into effect—thus threatening Cook Children's STAR & CHIP operations while it is still required to provide services under its current contracts.

12. TCHP has established that execution and implementation of the contracts would result in irreparable harm to TCHP because:

- TCHP's 425,000 STAR & CHIP members will be forced to change their health plans, impacting their access to care;

- TCHP has suffered and will continue to suffer disruptions in workforce—threatening the future viability of the health plan—as employees voice concern about job security in light of the intended contract awards;

- TCHP's 650 employees are at risk of losing their jobs, impacting the financial health of its entire Texas Children's Health Care System beyond that of the health plan;

- TCHP has already suffered and will continue to suffer the poaching of its well-trained employees by other MCOs—further endangering its operations while it remains under contract with HHSC;

- TCHP will lose members and providers, further threatening the viability of the health plan and confusing members and providers;

- TCHP has and will suffer damage to its reputation and goodwill; and

- TCHP's participation in the STAR Kids program is at risk because the larger STAR & CHIP contracts are needed to provide economies of scale to limit losses from STAR Kids. If TCHP loses its STAR Kids contract, its 26,000 STAR Kids members would need to change their health plans, thereby adversely impacting those members' access to care, adversely impacting TCHP's workforce, adversely impacting TCHP's ability to operate and damaging TCHP's reputation and goodwill.

13. Superior has established that execution and implementation of the contracts would result in irreparable harm to Superior because:

- Superior will experience a reduction in the number of STAR & CHIP members it serves today, forcing members to change plans even before the operational start date of the new contracts;

- Superior will need to begin reducing its workforce just as new MCO entrants and MCOs expanding their membership will seek to poach Superior's employees, who are already grappling with the uncertainty of their jobs in light of the intended awards;

- Providers will be less likely to contract with Superior as contract renewals are being negotiated over the next few months and Superior's leverage in provider contract negotiations will be substantially diminished;

- Superior has made substantial investments in partnerships that promote HHSC's value-based care priorities. These partnerships involve risk-sharing agreements

between Superior and the partner entities and have been built to scale over time. Superior will lose the benefit of its initial investments in these partnerships; and

- Superior's ability to provide the same level of service currently provided under existing STAR & CHIP contracts through the August 31, 2025, expiration date will be diminished due to workforce challenges that would be caused by execution of the STAR & CHIP contracts, which will impact Superior's operations and cause it to suffer reputational damage.

14. Wellpoint has established that execution and implementation of the contracts would result in irreparable harm to Wellpoint because:

- Almost 380,000 current Wellpoint members will be forced to change their health plan, thus losing access to their existing Wellpoint provider network;

- Wellpoint will be forced to consider substantial reductions in and/or relocations of its existing 1,200-plus-person workforce dedicated to the Texas Medicaid programs;

- Wellpoint has already suffered and will continue to suffer the poaching of its highly trained employees by other MCOs. During the review and transition period, which HHSC has stated will take at least a full year, Wellpoint must continue to provide uninterrupted healthcare to its members, and its ability to do so will be substantially jeopardized if there are key staff vacancies;

- Wellpoint has already suffered and will continue to suffer difficulty retaining its existing, robust provider network in the impacted service areas. Maintaining its network of healthcare providers is critical to Wellpoint's commitment to providing high-quality, cost-efficient healthcare for the entire duration of its existing contracts. Worse yet, Wellpoint has learned that some providers are informing members that Wellpoint will no longer be providing STAR & CHIP services in impacted areas and are encouraging them to switch plans on the basis of Defendant's intended contract awards;

- Wellpoint has made significant investments in service areas that it will be forced to exit and has longstanding provider partnerships with alternative payment models that were developed and built to scale over multiple years. Wellpoint will lose the benefit of its investments in those service areas and partnerships.

- There is no legal remedy that can fully compensate Wellpoint for (1) the loss of its members, (2) the harm to its business resulting from the intended, unlawfully procured contract awards, and (3) the harm to its ability to compete in a fair and lawful procurement process in future procurements; and

- The harm to Wellpoint is imminent because Defendant did not follow the requirements of Texas law in procuring the STAR & CHIP contracts but

nevertheless intends to execute and begin implementing the intended, unlawfully procured contract awards. In addition, the harm to Wellpoint is imminent as Defendant does not intend to correct her unlawful course of action for future procurements or the ongoing STAR Kids RFP.

15. Plaintiffs have also presented evidence that they will begin losing STAR & CHIP members now, even though operations under the intended STAR & CHIP contract awards are not scheduled to start until September 1, 2025. Providers are already informing Plaintiffs' members that Plaintiffs will no longer be providing STAR & CHIP services in certain service areas of the state and are encouraging members to switch plans. The confusion among providers and members alike will only worsen if the intended contract awards are executed notwithstanding the pending challenge to their legality.

16. Money damages are not adequate compensation because the harms Plaintiffs will suffer cannot be measured by any certain pecuniary standard. Furthermore, Plaintiffs cannot be adequately compensated in damages because Defendant is immune from suit for damages and any limited waiver of immunity is insufficient to compensate for Plaintiffs' harms.

17. The harms to Plaintiffs outweigh any potential harms to Defendant or HHSC that would result from preserving the status quo during the pendency of these consolidated cases. Neither Defendant nor HHSC would be harmed if the execution and further implementation of the intended STAR & CHIP contracts are delayed given that (1) operations under the intended contract awards are not scheduled to start until September 1, 2025, and (2) HHSC has previously delayed the RFP several times and was able to continue providing coverage through the current STAR & CHIP contracts by extending the contracts in effect at the time.

18. The public will not suffer harm if a temporary injunction is granted but will suffer harm if Defendant executes and implements the intended, unlawfully procured contract awards. The intended contract awards will impose significant harm and confusion on millions of Texas's

STAR & CHIP members. More than 1.5 million Texans, mostly children—and 43% of the total STAR & CHIP population—will be forced to change health plans. This in turn would cause significant harms to those beneficiaries, for which there is no adequate remedy at law available against Defendant, including:

- Confusion among those beneficiaries due to difficulties in informing them of the change in available health plans;

- Disruption to those beneficiaries' access to care and continuity of care, thereby threatening the medical care and the very health and welfare of those beneficiaries; and

- Administrative burdens of finding new health plans and potentially new healthcare providers.

19. The injunctive relief Plaintiffs request is narrow in scope and tailored to prohibit Defendant from continuing to act *ultra vires*. The balance of equities and public interest weigh in favor of granting Plaintiffs' requested injunctive relief.

Accordingly, it is therefore ORDERED that Defendant's Plea to the Jurisdiction is DENIED.

It is further ORDERED that Plaintiffs' Applications for Temporary Injunction are GRANTED. The Court ORDERS that:

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting processes for the STAR & CHIP RFP; and

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids RFP.

IT IS FURTHER ORDERED that Defendant shall provide notice of this Temporary Injunction to her officers, agents, servants, employees, and attorneys, as well as any persons or entities in active concert or participation with Defendant.

IT IS FURTHER ORDERED that Plaintiffs' bond or cash deposit in lieu of bond is set in the amount of $1,000.

IT IS FURTHER ORDERED that, on the filing by Plaintiffs of the bond and on approving the bond according to law (or the cash deposit in lieu of bond), the Clerk shall issue a Temporary Injunction in conformity with the law and the terms of this order.

IT IS FURTHER ORDERED that this Temporary Injunction shall not expire until final judgment in this case is entered or this case is otherwise dismissed by this Court.

IT IS FURTHER ORDERED that the trial on Plaintiffs' *ultra vires* claims seeking declaratory relief, permanent injunctive relief, and mandamus relief is set for November 3, 2025.

SIGNED on October 4, 2024.

_____
JUDGE PRESIDING

**Judge Laurie Eiserloh**
**455th District Court**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mandy Patterson on behalf of Amy Warr
Bar No. 795708
mpatterson@adjtlaw.com
Envelope ID: 102997305
Filing Code Description: Motion
Filing Description: Rule 29.3 Motion of Appellees Cook Children's Health Plan and Texas Children's Health Plan
Status as of 7/10/2025 4:41 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michaelle Peters | | mpeters@scottdoug.com | 7/10/2025 4:31:15 PM | SENT |
| Julie Wright | | julie.wright@nortonrosefulbright.com | 7/10/2025 4:31:15 PM | SENT |
| Amanda DoddsPrice | | amanda.price@squirepb.com | 7/10/2025 4:31:15 PM | SENT |
| Karen Burgess | 796276 | kburgess@burgesslawpc.com | 7/10/2025 4:31:15 PM | SENT |
| Robert Johnson | 10786400 | rjohnson@foley.com | 7/10/2025 4:31:15 PM | SENT |
| Richard Phillips | 24032833 | Rich.Phillips@hklaw.com | 7/10/2025 4:31:15 PM | SENT |
| J McCaig | 24070083 | meghan.mccaig@outlook.com | 7/10/2025 4:31:15 PM | SENT |
| Michelle Ku | 24071452 | mku@foley.com | 7/10/2025 4:31:15 PM | SENT |
| Joseph Knight | 11601275 | jknight@ebbklaw.com | 7/10/2025 4:31:15 PM | SENT |
| Amy Warr | 795708 | awarr@adjtlaw.com | 7/10/2025 4:31:15 PM | SENT |
| Warren Huang | 796788 | warren.huang@nortonrosefulbright.com | 7/10/2025 4:31:15 PM | SENT |
| Paul Trahan | 24003075 | paul.trahan@nortonrosefulbright.com | 7/10/2025 4:31:15 PM | SENT |
| Susan Harris | 6876980 | susan.harris@nortonrosefulbright.com | 7/10/2025 4:31:15 PM | SENT |
| Cheryl LaFond | 24104015 | clafond@scottdoug.com | 7/10/2025 4:31:15 PM | SENT |
| David Johns | | david@cobbjohns.com | 7/10/2025 4:31:15 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 7/10/2025 4:31:15 PM | SENT |
| Michelle Joyner | | mjoyner@scottdoug.com | 7/10/2025 4:31:15 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 7/10/2025 4:31:15 PM | SENT |
| Abril Rivera | | arivera@scottdoug.com | 7/10/2025 4:31:15 PM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 7/10/2025 4:31:15 PM | SENT |
| Kristin Hernandez | | kristin.hernandez@foley.com | 7/10/2025 4:31:15 PM | SENT |
| Thomas Coulter | 4885500 | tom.coulter@nortonrosefulbright.com | 7/10/2025 4:31:15 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mandy Patterson on behalf of Amy Warr
Bar No. 795708
mpatterson@adjtlaw.com
Envelope ID: 102997305
Filing Code Description: Motion
Filing Description: Rule 29.3 Motion of Appellees Cook Children's Health Plan and Texas Children's Health Plan
Status as of 7/10/2025 4:41 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Thomas Coulter | 4885500 | tom.coulter@nortonrosefulbright.com | 7/10/2025 4:31:15 PM | SENT |
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 7/10/2025 4:31:15 PM | SENT |
| Jessie Johnson | | jessie.johnson@nortonrosefulbright.com | 7/10/2025 4:31:15 PM | SENT |
| Benjamin Grossman | | bjgrossman@foley.com | 7/10/2025 4:31:15 PM | SENT |
| Cory Scanlon | | cory.scanlon@oag.texas.gov | 7/10/2025 4:31:15 PM | SENT |
| Katie Dolan-Galaviz | | kgalaviz@burgesslawpc.com | 7/10/2025 4:31:15 PM | SENT |
| Karen Walker | | karen.walker@hklaw.com | 7/10/2025 4:31:15 PM | SENT |
| Tiffany Roddenberry | | tiffany.roddenberry@hklaw.com | 7/10/2025 4:31:15 PM | SENT |
| Jennifer Cook | | Jennifer.Cook@oag.texas.gov | 7/10/2025 4:31:15 PM | SENT |
| Juliana Bennington | | jbennington@perkinscoie.com | 7/10/2025 4:31:15 PM | SENT |
| Jonathan Hawley | | jhawley@perkinscoie.com | 7/10/2025 4:31:15 PM | ERROR |
| Reina A.Almon-Griffin | | ralmon-Griffin@perkinscoie.com | 7/10/2025 4:31:15 PM | SENT |
| Trisha Marino | | tmarino@perkinscoie.com | 7/10/2025 4:31:15 PM | SENT |
| Perkins Docketing Team | | DocketSEA@perkinscoie.com | 7/10/2025 4:31:15 PM | SENT |
| Stacey Obenhaus | | sobenhaus@foley.com | 7/10/2025 4:31:15 PM | SENT |
| Jason R.LaFond | | jlafond@scottdoug.com | 7/10/2025 4:31:15 PM | SENT |
| Matthew Gordon | | mgordon@perkinscoie.com | 7/10/2025 4:31:15 PM | SENT |
| Anna Baker | 791362 | abaker@adjtlaw.com | 7/10/2025 4:31:15 PM | SENT |
| Mandy Patterson | | mpatterson@adjtlaw.com | 7/10/2025 4:31:15 PM | SENT |
| Stacey Jett | | sjett@adjltaw.com | 7/10/2025 4:31:15 PM | SENT |